JERRY'S RIDES, INC. *v.* MAYOR AND CITY
COUNCIL OF BALTIMORE ET AL.

[No. 337, September Term, 1960.]

162

*Decided July 7, 1961.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*Benjamin Lipsitz,* with whom was *Gerald H. Cooper* on the brief, for the appellant.

*John J. Sweeney, Jr.,* for Allied Amusements, Inc., one of the appellees.

*Robert M. Winegrad, Assistant City Solicitor of Baltimore,* with whom were *Harrison L. Winter, City Solicitor,* and *Ambrose T. Hartman, Deputy City Solicitor,* on the brief, for the other appellees.

HAMMOND, J., delivered the opinion of the Court.

The appellant, Jerry's Rides, Inc. (Jerry), which had unsuccessfully sought a concession to operate trackless trains through the Baltimore Zoo area in Druid Hill Park, brought a mandamus action against the Board of Recreation and Parks and the Board of Estimates of Baltimore to require (a) that a contract for the operation of the trains awarded a competitor, Allied Amusements, Inc. (Allied), be awarded to Jerry, or (b) that the contract be cancelled, or (c) that it be cancelled and competitive bids be called for. The claim of Jerry was that the action of the city authorities in awarding the contract to Allied was illegal, arbitrary, capricious and unreasonable. Allied intervened, and the case was heard by Judge Tucker and a jury. Judge Tucker ruled there was pre-

sented no issue of fact for the jury to pass on and that, as a matter of law, the exercise of the judgment of the City authorities in awarding the contract to Allied could not be disturbed by the court. Jerry appealed from the dismissal of the petition for mandamus.

The Park Board decided in early 1960 to provide trackless trains to carry sightseers to various parts of the Zoo. A number of persons interested in providing and operating the trains submitted proposals. Allied made an oral proposal on February 2. Jerry, on March 7, made an offer to furnish and operate two trackless trains (open air cars pulled by gasoline-powered tractors) made by a named manufacturer and costing about $24,000 apiece over a designated four-stop route. The suggested fare was ten cents between stops and thirty-five cents for the complete trip. The contract was to be for five years, with an option to renew for another five years. The City was to receive twenty-five per cent of the gross receipts. On March 8, Allied made a written offer to furnish the same equipment, run over the same route for the same period of time at the same fares and to pay twenty-seven and one-half per cent of the gross receipts to the City.

The Park Board appointed a committee to investigate the matter of installing trackless trains and the desirability of the various bidders and their proposals, consisting of a member of the Board and the Director of Parks, the Acting Superintendent of Parks, and the Zoo Director. In its written review of the background of the bidders, the committee set out the names of the individuals who owned the various corporate bidders, noting that Allied's owners (one of whom was a successful concessionaire) were business men of stature, achievement and good reputation, and recommended (1) that the term of the concession be five years with an option for another five years, the City to own the trains at the end of ten years; (2) the trains were to be of a type made by a specified manufacturer; (3) the fares were to be ten cents between stops and thirty-five cents for the entire ride; (4) the route was to be established by agreement, subject to change by agreement as the Zoo grew; (5) property damage and personal liability insurance was to be carried by the con-

cessionaire in named amounts; (6) the concessionaire was to furnish a surety bond of $1,000; and (7) that consideration be given to the sound business and financial stability and "best experience" of the respective would-be concessionaires. The committee selected Allied as the bidder with the second soundest business and financial stability, and Jerry as the bidder with the best experience.

At a meeting on April 5, the Park Board received and adopted in substance the recommendations of the committee. The members of the Board then talked to representatives of the bidders, one by one. Jerry repeated its original proposal with an increase of its offer to the City from twenty-five to thirty per cent of the gross receipts. Allied reoffered 27½% of the gross receipts, but added 5% of gross income to be expended with the approval of the Park Board for the advertising and promotion of the train rides and the attractions of the Zoo. After hearing from all of the bidders, the Board decided that the offer of Allied, in the light of its sound business and financial stability, was in the best interests of the City and awarded it the contract. The award was later confirmed by the Board of Estimates.

Although it obviously did not feel that way until after the contract was awarded to Allied, Jerry contended below and contends here that the provisions of Sections 37 and 38 of the Charter and Public Local Laws of Baltimore City (Flack) 1949, required that the Park Board award the contract only after competitive bidding. Section 37 says that "In contracting for any public work, or the purchase of any supplies or materials, involving an expenditure of two thousand dollars or more, for the City or by any municipal agency * * *" proposals must be published twice in two or more daily newspapers of the City prior to the day set for the opening of bids, which Section 38 requires in such instances. There is no substance to this contention. The City was expending no money either for a public work or for the purchase of supplies or materials. Even if it be assumed that the trackless trains could be considered in the category of public works, all of the money to be expended was to be furnished by the concessionaire.

Jerry's further and main contention was below and now is that the action of the Park Board and the Board of Estimates in awarding the concession to Allied was arbitrary and unsupported by substantial evidence, and hence illegal. It argues that if Allied was selected on any rational basis, it was because it was found to have been peculiarly qualified in the category of "sound business and financial stability" and that there is no evidence that the Board had before it any facts on which to base its decision that Allied was sound financially and businesswise. We think the record refutes this contention. The committee had before it the successful business background and experience and the good reputation of the owners of Allied. Counsel for Allied told the Park Board at an official meeting in the presence of his clients that they were financially sound and had sufficient money available to purchase for cash the two trains costing $24,000 each, and additional trains if the operation proved that they were needed. The president of the Park Board testified that at the April meeting he had personally queried the three owners of Allied and satisfied himself of their ability to buy the trains for cash. As against this, the Board noted unfavorably that after fourteen years of experience in the concession and amusement field, the owners of Jerry had accumulated but a small surplus and that it proposed to purchase the trains on time payments.

The judgment of the Park Board after due deliberation and consideration was that the business experience and financial soundness of Allied and its proposal to pay out 32½% of the gross receipts, 27½% to the City and 5% for advertising to further the success of the train and the attractiveness of the Zoo to sightseers, made it the bidder most likely to further the best interests of the Zoo and the City.

We think there was a rational basis for the conclusions reached and the actions taken by the administrative agency, the Park Board, and, once this determination is made by us, the judicial function is exhausted. (We assume, for the purpose of the decision, that despite the admitted discretion of the Park Board to choose the concessionaire it felt would best serve the public interest, that mandamus was an appropriate remedy.)

The Park Board is not charged with bias, fraud or corruption. In *Masson v. Reindollar,* 193 Md. 683, 689, and *Board of Education of Carroll County v. Allender,* 206 Md. 466, 475, we reiterated that a court will not review or control the exercise of discretionary power confided to an administrative agency unless such exercise is fraudulent or such an abuse of discretion as to amount to a breach of trust because, as the *Masson* case said: "Any other rule would have the effect of substituting the decisions of the courts for the discretion reposed in the Commission * * * taking out of the hands of a single State agency the administration of their important functions and placing them in the hands of the courts."

*Snowden v. Mayor & C. C. of Baltimore,* 224 Md. 443, 445, said the substantial evidence test means that the Court's inquiry is whether on the evidence the agency could reasonably have made the finding it did and that substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion, and said also: "The court will correct illegal actions and those which are arbitrary and unreasonable because they are not based on substantial evidence but it will not substitute its own independent examination of or its own judgment on the facts for those of the agency to which the carrying out of state policy has been delegated."

Tested by the standards established by the cases, we think Judge Tucker's action in dismissing the petition for mandamus was correct.

*Order affirmed, with costs.*