## MITCHELL BUSINESS EQUIPMENT COMPANY, INC. *v.* BOARD OF EDUCATION FOR ST. MARY'S COUNTY

[No. 352, September Term, 1967.]

*Decided October 14, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, McWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*A. V. Cherbonnier,* with whom was *Charles A. Norris* on the brief, for appellant.

*Robert E. Wigginton,* with whom were *Loker & Wigginton* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

Mitchell Business Equipment Company, Inc., a Maryland corporation (Mitchell), a franchised dealer of Underwood, Remington, R. C. Allen and Adler typewriters in St. Mary's County, filed a petition in the Circuit Court for St. Mary's County on July 31, 1967, against the Board of Education for St. Mary's County (the Board) for an order of that court restraining the Board from executing a contract with Free State Business Machines, Inc. (Free State) for the purchase of certain Royal typewriters in accordance with the acceptance of Free State's bid by the Board on July 25, 1967. The Circuit Court (Dorsey, J.) filed a written opinion indicating that the Board had acted properly and in accordance with the provisions of Code (1957) Article 77, Section 75 and on September 18, 1967, filed an order dismissing the petition, as amended, and requiring the petitioner, Mitchell, to pay the costs. Mitchell filed a timely appeal from this order. We are of the opinion that the Chancellor correctly decided the case and will affirm the order of the lower court.

Free State is a Maryland corporation, an authorized agent of Royal typewriters for St. Mary's County, as well as Charles County and the southern portion of Prince George's County. It sells no other make or brand of new typewriter.

In December 1966 or January 1967, the Board began negotiations with Free State for the purchase of Royal typewriters to be used for the instruction of pupils in the public schools of St. Mary's County, and communicated with Mitchell in regard to prices of certain typewriters sold by it. Free State submitted a formal bid for 210 new Royal typewriters and the Board, at that time considering the typewriters as "instructional material," decided that it was not necessary to follow the procedures of Code (1957) Article 77, Section 75 requiring advertisements for bids. Accordingly the contract was awarded to Free State for $40,477.00 less a trade-in allowance of $8,477.50, or a net cash payment by the Board of $32,029.50. When Mitchell objected to the awarding of the contract to Free State, the Board, after consultation with the State Board of Education and the office of the Attorney General, cancelled the contract with Free State, and, in accordance with the provisions of Article 77, Section 75, advertised for bids to be opened at 2:00 p.m. (EDST) on July 14, 1967. The Board in its specifications for the contract designated specific models of Royal typewriters, pursuant to the provision of Section 75 which authorizes the Board to name "the particular make, kind or brand of the article or articles to be purchased."

Free State's bid, submitted on July 10, 1967 was, in relevant part, as follows:

| Item No. | Item | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| 1 | Royal Model 440 | 140 | $159.50 | $22,330.00 |
| 2 | Royal Model 550 | 62 | 259.50 | 16,089.00 |
| 3 | Royal Model 660 | 4 | 330.00 | 1,320.00 |
| 4 | Royal Model 551 (293.50) and Key punch training tandem (40.00) | 4 | 333.50 | 1,334.00 |
| | Total price of all items | | | $41,073.00 |
| | Trade-in allowance | | | 7,253.09 |
| | Sub-Total | | | $33,819.91 |

Attached to the bid was a list of serial numbers of typewriters to be traded in.

By four separate bids all dated July 12, 1967, Mitchell presented bids for Adler, Remington, R. C. Allen and Olivetti Underwood typewriters. In all bids, the trade-in allowance was $7,040.00.

The Adler bid submitted for Item 1, the Adler U20 with a unit price of $129.25, a total of $18,095.00; for Item 2, the Adler E21S with a unit price of $243.93, a total of $15,123.66; for Item 3 the Adler E21C with a unit price of $336.15, a total of $1,344.60; making a total of these three items of $34,563.26. There was no bid on Item 4.

In the Remington bid, the Remington Standard was submitted for Item 1 at a unit price of $150.00, a total price of $21,000.00. In regard to Items 2 and 3 the entry was "No bid — delivery uncertain"; and the entry for Item 4 was "no bid."

In the R. C. Allen bid, the R. C. Allen Model B11 was submitted at a unit price of $150.00, a total price of $21,000.00. In regard to Items 2, 3 and 4, the entry was "no bid."

In the Olivetti Underwood bid, the Olivetti Underwood TM5, with service, was submitted at a unit price of $112.00 for the typewriter and $20.00 for service, a total unit price of $132.00, and a total price of $18,480.00; the Electric Underwood, Model 700 was submitted for Item 2 at a unit price of $259.00, a total price of $16,058.00; the Electric Underwood, Model 702 was submitted for Item 3 at a unit price of $310.00, a total price of $1,240.00; and, in regard to Item 4, no bid was submitted. The total price of all items on the Olivetti Underwood bid was $35,778.00.

On all of the Mitchell bids the following notation was added: "Enclosed Trade-in allowances may be used toward any or all of the above items." As already indicated, the trade-in allowance on all Mitchell bids was $7,040.00.

There was some testimony that although the net amount of the bid submitted on the Royal contract was in excess of the net amounts on the Mitchell bids, the established future allowances which would be made for used Royal typewriters as compared with similar allowances which would be made for the

other brands would ultimately result in a lower cost of typewriters to the County.

There was no allegation in the petition and there was no contention made in the lower court or before us that the Board was guilty of actual fraud or that it acted corruptly in this matter.

The principal legal question presented to us for decision is whether the typewriters in question fall under the provisions of Article 77, Section 146 as "materials of instruction" or under Article 77, Section 75 as "equipment of any sort." In order to determine this question it is necessary to consider the provisions of the two sections involved.

Section 75 provides as follows:

"Where the cost of any school building, *improvement, supplies* or *equipment of any sort* exceeds the sum of five thousand dollars, the board of education in each county *shall advertise for bids* in one or more newspapers published in their respective counties, publication of such advertisement to appear at least one week prior to the date on which bids are to be filed, and the *contract for any such* school building, improvements, *supplies or other equipment shall be awarded to the lowest responsible bidder, conforming to specifications,* with consideration being given to quantities involved, time required for delivery, purpose for which required, competency and responsibility of bidder, and his ability to render satisfactory service, but the board of education in the respective counties shall have the right to reject any and all bids and to readvertise for other bids, and any contract entered into or purchase made in violation of the provisions of this section shall be null and void; provided, however, that the provisions of this section *shall not apply to contracts for the purchase of books and/or other materials of instruction,* and *provided further that the board of education in any county shall be permitted to name in the specifications and advertisements for bids under this section the particular make, kind or brand of article*

*or articles to be purchased or contracted for,* and provided further that nothing in this section shall apply to the emergency repairs during the period of the regular school year. Provided, however, in Talbot County and in Charles County, the county commissioners shall have the right to reject any and all bids and to direct the board of education of Talbot County and Charles County to readvertise for other bids and in any event the board of education shall not enter into any contract for the remodeling of schools and the construction of new schools until the bid and contract have been approved by the county commissioners." (Emphasis supplied.)

Section 146 provides as follows:

"The Board of Public School Commissioners of Baltimore City and each county board of education *shall adopt and purchase,* subject to the provisions of this article, *textbooks, supplementary readers, materials of instruction, stationery and school supplies for use in the public schools of said city and of the several counties of this State. When so purchased, the necessary textbooks, supplementary readers, materials of instruction, stationery, and school supplies shall be furnished free of cost* for use in the public schools of the State, provided that no regular textbooks or series of textbooks shall be changed more often than once in three years. *It shall be the duty of the Board* of School Commissioners of Baltimore City and of the county boards of education of the several counties *to furnish textbooks in ample and sufficient quantities to the several grades* in the public schools; *thereafter supplementary readers, materials of instruction, stationery and school supplies shall be furnished in adequate quantities* to the several grades in the public schools, provided that parents or pupils may purchase their textbooks, stationery and school supplies, if they desire to do so. *The said respective boards shall adopt means for the purchase of* textbooks, supple-

mentary readers, *materials of instruction, stationery and school supplies* by *competitive bidding, and at the lowest possible price consistent with quality,* and each of said boards *shall furnish annually* to the State Superintendents of Schools the title, the name of the publisher, and the net price of each textbook and supplementary reader purchased under the provisions of this article." (Emphasis supplied.)

Section 146 comes under Chapter 11 of Article 77 which has the subtitle of "Textbooks and School Supplies." This subtitle or the subtitle "Textbooks" has been the subtitle under which this statutory provision was placed since 1870 when the General Assembly first passed a law relating to textbooks for the public schools. See the Acts of 1870, Chapter 311. The words "materials of instruction" as they now appear in Section 146 were first inserted in the statute by the Act of 1916, Chapter 506, Section 68. In our opinion the General Assembly intended that these rather general words should have a limited construction to mean "materials of instruction" like stationery, and school supplies, having a relatively short useful life and often consumed during a school year. See *Comptroller of Treasury v. Crofton Co.,* 198 Md. 398, 84 A. 2d 86, 30 A.L.R. 2d 1434 (1951) in which Judge Markell, for the Court, stated:

" 'Manufacture', 'product' and like words are words of broad scope. Like other words, they must be construed, broadly or narrowly, in the light of their context and the legislative purpose." (198 Md. at 403, 84 A. 2d at 88.)

The words "equipment of any sort" are words of broad meaning. "Equipment" is defined in Webster's New International Dictionary (2d Ed. 1950) as: "Materials or articles used in equipping, as for an expedition; the articles comprised in an outfit, as furnishings or apparatus, equipage; as, laboratory *equipments.*" In 30 C.J.S. 754-55 (1965) "equipment" is defined as:

"An exceedingly elastic term, the meaning of which depends on the context in which it appears. It is vari-

ously defined as meaning the act of equipping or fitting, or the state of being equipped, as for a voyage or an expedition; the act or process of equipping with all needful supplies for any special service; anything used in equipping; * * * and it has been said that, although in its plain, ordinary, and usual application the word may embrace all the appliances and furnishings necessary for, or usual in, the operation of an establishment or institution, it may nevertheless be restricted in its application, by the use of other words in the enactment or instrument in which it occurs."

The words "equipment of every sort" were in the original statute passed in 1933 (see Acts of 1933 Chapter 151, Section 59 B) and follow the words "school building, improvement, supplies * * *." In our opinion the General Assembly intended these words to include "equipment of any sort" used for educational purposes and which remains on the school premises from year to year, like blackboards, school desks, typewriters and the like.

In the present case, a rather broad construction of the word "equipment" is indicated by the addition of the words "of any sort," limited, however, by the valuation requirement of $5,000.-00 (originally $1,000 in the Act of 1933, Chapter 151).

Although the line to be drawn between "equipment of any sort" and "materials of instruction" in the two sections may in some future case be a difficult one to draw, we are of the opinion that in this case, typewriters comfortably come within the ambit of "equipment of any sort" in Section 75 rather than in that of "materials of instruction" in Section 146. As the Board suggested in its brief, a card showing the keyboard and where the fingers should be placed would come within the meaning of a "material of instruction" as would a recipe used in teaching Home Economics, but the typewriter and the cook stove would come within the meaning of "equipment of any sort."

As we have indicated, there were no allegations in the petition, no proof and no contention that the Board was guilty of actual fraud or collusion. In the absence of such allegations and

proof we will not review the Board's discretion where it acts within the scope of its authority. *Jerry's Rides, Inc. v. Mayor and City Council of Baltimore,* 226 Md. 161, 167, 172 A. 2d 487, 489 (1961).

Inasmuch as the Board had the power under Section 75 to designate a make or brand name in the specifications and lawfully did this, it is clear that the bids of Mitchell did not meet those specifications, so that the Board properly accepted the bid of Free State and should not be restrained from executing a contract with Free State as prayed in the petition of Mitchell.

In view of our decision on the principal question involved in this appeal, which requires an affirmance of the order of the trial court, we do not deem it necessary to pass upon any other questions in the case.

*Order affirmed, the appellant to pay the costs.*