# FRANK EARLY *v.* STATE OF MARYLAND

[No. 33, September Term, 1971.]

*Decided October 19, 1971.*

The cause was argued before MORTON, ORTH and POWERS, JJ.

*David L. Saltzman* for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Peter Karceski, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The basic question in this case is whether the judge presiding at the bench trial of Frank Early in the Criminal Court of Baltimore was clearly erroneous in his judgment that the evidence established that Early feloniously murdered Hubert Johnson, wilfully and of premeditated malice aforethought, and that he unlawfully conspired with Theodore Daniels and Henry Jones and others to murder Johnson.[1] Maryland Rule 1086; *Williams v. State,*

---

1. On 31 July 1969 two indictments were returned against Daniels, Jones and Early. No. 5295 jointly charged them with the murder of Johnson on 19 July 1969. No. 5297 charged them with the conspiracy on 18 July and "continuously up to and including 19 July." The defendants were separately tried at bench trials in the Criminal Court of Baltimore.

Jones came to trial on the conspiracy charge on 6 May 1970 be-

5 Md. App. 450. There is no doubt that the manner of Johnson's death was homicide. The report of the autopsy so stated, adding "stabbed by unknown assailant." Johnson was found dead in his home in his bed, lying on his back in a pool of blood. The pathological diagnoses of the Medical Examiner included "Multiple stab wounds (151) of head, neck, trunk and extremities involving heart, aorta with major branches, jugular system, trachea, lungs, kidneys, small bowel." It was the opinion of the Medical Examiner that "Hubert Johnson died of multiple stabwounds."

Ordinarily the autopsy report and the testimony of the State's witness James Henry Watkins, Jr. would be ample to prove the offenses beyond a reasonable doubt. Watkins testified that he talked to Henry (Hank) Jones "the same day of the homicide, later on that evening." Watkins asked Jones what had happened. Jones said: "[T]hey had went up to wherever this was [Johnson's home] [2] * * * and this is what Hank told me, he said that he sat in the car and Jody [Frank Early] and Ted Daniels went into the house and then he went on to explain it. He didn't have anything to do with it but that Johnson was dead." Watkins said that Jones told him that Daniels' alibi was to be that he was in Philadelphia at the time of the murder. Watkins further testified that six days after the murder, on 25 July, Early said that he had gone to Athol Gate Lane on 19 July and killed the

---

fore Liss, J., and the verdict was held sub curia. On 3 December a verdict of guilty was rendered and he was sentenced to 15 years. The same day a stet was entered as to the murder indictment by order of Sodaro, J.

Daniels came to trial on the conspiracy charge on 15 September 1970 before Sodaro, J., and the verdict was held sub curia. On 3 December a verdict of guilty was rendered and he was sentenced to 15 years. The same day a stet was entered as to the murder indictment by order of Sodaro, J.

Early came to trial on both indictments on 21 September 1970 before Solter, J., and the verdicts were held sub curia. On 27 November he was found guilty of murder in the first degree and the conspiracy. He was sentenced to concurrent sentences of life imprisonment and 15 years respectively.

2. The evidence showed Johnson lived at 109 Athol Gate Lane, Apartment B, Baltimore City. In the transcript of the testimony it is referred to as "Applegate Lane" or "Applegate Drive."

man who lived there, indicating that Daniels and Jones had been with him. According to Watkins, Early had agreed to kill Johnson for a price of $200 to be paid by Jones who had asserted he "wanted the bitch rubbed out." Watkins knew that Jones was a homosexual and "gathered" that Daniels was also. Watkins testified that Jones told him that Daniels wanted to get rid of Johnson with whom Daniels was living because Daniels and Jones were in love and were now going together. The credibility of a witness is for the trier of fact. *Borman v. State,* 1 Md. App. 276. The lower court believed Watkins.[3] Thus, although the evidence would not have been sufficient to sustain the convictions without his testimony, under normal circumstances it would have been enough with his testimony. But we believe that Watkins was an accessory before the fact to the felony of murder and a principal in the misdemeanor of conspiracy.[4] He was therefor an accomplice, that is "one who knowingly, voluntarily and with common criminal intent with the principal offender, unites with him in the commission of the crime either as a principal or as an accessory before the fact." *Strong v. State,* 261 Md. 371, 377, quoting *Burley v. State,* 5 Md. App. 469, 472. As Watkins was an accomplice, Early could not be convicted on his uncorroborated testimony.

The Court of Appeals has fully considered the propriety of the rule that a person accused of crime may not be convicted on the uncorroborated testimony of an accomplice. The rule as it is applied today is substantially the same as when it was formulated in 1911 by the decision in *Luery v. State,* 116 Md. 284, in which the historical background as well as the reasoning behind the rule were set forth. In *Watson v. State,* 208 Md. 210, 217, the

---

3. The court said in rendering its verdicts: "And I might say at the outset that I was impressed by Watkins' testimony and that I don't believe that his credibility was impaired on cross-examination to any extent that would effect the Court's evaluation of the credibility and, therefore, the weight of his testimony."

4. Participants in misdemeanors, if liable, are punishable as principals, but parties to a felony are classified as principals or accessories. *Agresti v. State,* 2 Md. App. 278.

necessity of corroboration of an accomplice's testimony was stated to be firmly established in this State. Recognizing that many courts have refused to follow the rule requiring corroboration of the testimony of an accomplice and that some authorities, such as Wigmore, did not support the requirement of corroboration, see *Wright v. State,* 219 Md. 643, 647 and 649-650, the Court of Appeals has not retreated from its position and has steadfastly applied the rule. See id. notes 2 and 3 at 648; *McDowell v. State,* 231 Md. 205, in which cases after *Wright* dealing with corroboration were cited at 213; *Veney v. State,* 251 Md. 158, 168-169. As recently as *Strong v. State, supra,* decided 7 April 1971, the Court flatly stated with regard to the testimony of an accomplice that "it is established that his testimony would have to be corroborated for it to sustain a conviction." At 377. This Court from its inception has consistently followed the dictate of the Court of Appeals and invoked the rule. See *Bright v. State,* 1 Md. App. 657 decided 22 August 1967, *Foxwell v. State,* 13 Md. App. 2, and the myriad of opinions intervening, especially *Burley v. State, supra,* cert. denied 9 April 1969.

The lower court found that Watkins was not an accomplice and in that we find its judgment on the evidence clearly erroneous. In *Foster v. State,* 11 Md. App. 40, 46, we repeated the definition of an accomplice set out in *Burley v. State, supra,* and approved in *Strong v. State, supra,* as "one who knowingly, voluntarily, and with common criminal intent with the principal offender unites with him in the commission of the crime either as a principal or as an accessory before the fact." We continued, "* * * and this definition encompasses advocating, encouraging, aiding or abetting the commission of the crime, * * *. To be an 'aider', a person must assist, support or supplement the efforts of another; to be an 'abettor', a person must instigate, advise or encourage the commission of a crime and may in some circumstances include a person who is present at the commission of the crime without giving active assistance." (citations omit-

ted). The generally accepted test as to whether a witness is an accomplice was stated in *Burley,* at 472, to be "whether he himself could have been convicted for the offense, either as a principal or accessory before the fact."[5] We said in *Burley,* at 473, that the fact that a witness is an accomplice must be shown by proof, like any other fact, but the burden is on the defendant who asserts it. We observed that only a preponderance of the evidence is necessary to prove that a witness is an accomplice. Upon a bench trial, our function on appellate review is to determine whether the judgment of the court on the evidence was clearly wrong under Maryland Rule 1086.

An accessory before the fact in a felony is one who procures, counsels, or commands the deed perpetrated, but who is not present, actively or constructively, at such perpetration. *Agresti v. State, supra,* at 280. We feel that Watkins' own testimony showed him to be an accessory before the fact to the murder and a principal in the conspiracy. A pertinent synthesis of it follows. Watkins, Early and Jones knew each other as they lived in an apartment building at 902 Lake Drive, Watkins and Early each having an apartment on the second floor and Jones on the eighth floor. About the middle of June 1969 Jones had met Watkins in front of the building and Jones "asked me if I knew anybody who—his exact words, 'Anybody who could get rid of somebody for some money.' Now, he said, 'Beat them up, run them out of town or anything.' These were his words * * *." Later, however, Watkins learned the man Jones wanted to get rid of was Johnson. He told Jones he did not know anybody for that and for a month made no effort to get somebody to do the job for Jones. On 19 July about 3:00 a.m. he was on the front steps of the apartment building with Early. A yellow Malibu automobile with a black top pulled up. It belonged to Daniels. There were three occupants, one

---

5. For the ways in which the test has been variously stated see *Burley,* note 2 at 472-473 and *Foster v. State, supra,* at 46.

of whom was Jones who got out and entered the building. A short time later after going to the apartment of a friend named Douglass on the eighth floor to get beer, they passed Jones standing in the door of his apartment. Jones invited them in to have a beer. Out of the hearing of Early and Douglass, Jones asked Watkins if he remembered the conversation they had about a month before. Jones asked Watkins again if he knew somebody to do the job and Watkins said that he "didn't know anybody who would do this." Watkins, Early and Douglass returned to the front steps. Douglass left to go to bed. On direct examination Watkins said: "Well, it was then at this time that I said to Jody [Early] and in a joking manner, I said, 'Jody - - -' I said, 'Hank wants somebody - -' and my words were, 'Hank wants somebody knocked off for some money', like that, and I dropped it." On cross-examination he said that he told Early "as a gesture, you know, what Hank Jones had said to me in the apartment * * * that he wanted the bitch rubbed out." As recounted in his direct examination, "[a] few minutes later Jody said, 'Well, where is Hank', and I looked at him and I asked him was he serious and he said yes, and I said, 'Well, he's upstairs'. Well, he said, 'Tell him I want to see him'. I said, 'Okay' ". Shortly thereafter about 4:00 a.m. Watkins went to Jones' apartment. Watkins told him: "Hank, Jody wants to see you concerning the deal we were talking bout." Jones replied: "Okay, tell him I'll get in touch with him" and Watkins answered, "Okay". Watkins went back to the front steps and talked awhile with Early and a man named Hood who had arrived on the scene. Hood left. Early asked Watkins if he thought Jones was still up. Watkins said: "Well, we can see". They went to the eighth floor and rapped on Jones' door. They knocked three or four times but there was no answer. Watkins and Early each went to his own apartment. In a short time Jones came to Watkins' apartment. "[H]e asked me then, he asked me where was Jody and I told him Jody was in bed. So, he said—he said, 'Well, I have to

see him'. I said, Well, I told him I said, 'Well, I don't know, Jody's in bed now'. He said, 'Well, what apartment does he live in', and I told him he lives in Apartment 6C. Well, Hank then asked me if I would rap on Jody's door for him. * * * So I said, okay. We left my apartment and took the steps this time, no elevator. We walked up to the sixth floor. When I got to the sixth floor I went to Jody's door and I rapped on the door and I said to—I said to Jody, 'Jody, Hank wants to see you'. Jody had at this time—he was in bed, he didn't have nothing on, no more than his underwear, and he had cracked a little bit and I said, I told him that Hank wanted to see him. He said, 'Okay, tell him I'll be right out'. I stood there for awhile. Jody had slipped on some pants or something and he came out into the hall. I then said, I then asked Hank, I said, 'Do you want me because I have to go to work the next morning, this morning rather', and he said no. I then turned around and I left them in the hall and I went on back to my apartment. * * * To the best of my knowledge it was then approaching 5:00 o'clock."

Watkins went to bed. He awoke about 7:00 a.m., dressed and started to go to work. He left the apartment building by the rear door and saw "the yellow and black Malibu" which Jones had gotten out of a few hours before, parked in the back of the building. He returned from work about noon and after straightening his "apartment up a little bit" went to Early's apartment to get a television set he had left there. Early's wife admitted him and told him he could get the TV in the bedroom. Early was still in bed. He awoke. "I asked him if he went with Hank the night before and he says, yes, he did. I asked no more questions, I didn't ask him anything else after that." He noticed that Early had a cut on his little finger which had not been there when he left him in the early hours of the day. Early came to Watkins' apartment in the evening of 25 July. "He had asked me if I had seen Hank, Hank Jones, and I told him no. Well, he told me if I saw him to tell him that he wanted to see him and specifically he said to ask him when his boy was

going to come through." It was then that Early told Watkins that he had killed Johnson.

Watkins' complicity was made abundantly clear on cross-examination. The first time he said anything to the police about the matter was on 30 July when he gave a verbal statement to them and then only after being taken into custody. The officers had come to his place of employment and told him they wanted to see him downtown because they had questions to ask him. "They asked me simple questions as to if I knew Jody, if I had ever been on [Athol Gate] Drive and if I knew anything about a murder being committed. Well, during this time, I answered no questions because I was—I wanted to talk to somebody before I answered anything, any questions. * * * When they first questioned me about knowing anything about it, I denied it * * *." It was after he talked to his father and a lawyer that he told the police what he knew. He said he had denied any knowledge of the murder at first to protect Early. Watkins made evident on the cross-examination of him that he told Jones that Early would talk to him about the deal and that Jones said he would "keep in touch". Watkins admitted that he knew what the deal was and that he told Early that Jones would pay $200 for the job. He denied he was getting anything out of it. Defense counsel asked him: "You were arranging a murder, participating in a conspiracy to murder * * * and you were getting nothing out of it?" Watkins replied: "That's correct". He expressly agreed that he had "participated" and was "a link in the chain that led to the death of Hubert Johnson." And he admitted that he knew when he talked to Early that Daniels was living with Johnson in a homosexual relationship and that Daniels and Jones wanted to get rid of Johnson because Daniels and Jones were in love and going together.[6]

We have no difficulty in determining that the evidence

6. The defense offered no evidence. The testimony of character witnesses for Early, received out of order, was stricken upon motion of the State when Early elected not to testify.

in law was sufficient to establish that Watkins was an accomplice in both crimes. At the least by a preponderance it showed that he knowingly, voluntarily and with common criminal intent united with Early to murder Johnson by encouraging, aiding and abetting within the meaning of those words as discussed in *Foster v. State, supra,* at 46 the commission of that crime before its commission so as to be an accessory before the fact in the felony. And at the least by a preponderance it showed that he and Early and Jones had an understanding, a common design, in regard to the unlawful purpose which was the conspiracy as charged and thus each was a principal in the misdemeanor. *LaFortez v. State,* 11 Md. App. 598; *Jones v. State,* 8 Md. App. 370.[7]

We think it patent on the record that the convictions could not stand without crediting the testimony of Watkins. And for the testimony of Watkins to sustain the convictions, it must be corroborated. The lower court, appreciating that there were "rather fine and clearly cut issues involved", made an alternative finding. It determined, assuming that Watkins was an accomplice, that his testimony was sufficiently corroborated. With this we are in accord.

" 'Corroborate' means to strengthen, not necessarily the proof of any particular fact to which an accomplice has testified, but the probative, criminating force of his testimony." *Wright v. State,* 219 Md. 643, 649, quoting with approval 1 Underhill *Criminal Evidence* (5th ed. 1956) § 185. It is settled that the corroborative evidence must tend either: (1) to identify the defendant with the perpetrators of the crime, or (2) to show the defendant's participation in the crime itself. *Foxwell v. State, supra; Spies v. State,* 8 Md. App. 160. If with some degree of cogency it tends to establish either of these matters it

---

7. The lower court concluded that "the most that Watkins did in this case was introduce these two people [Early and Jones] and that he is, therefore, not an accomplice, not an accessory * * *." In our view the evidence neither permits nor supports this conclusion. Thus the court was clearly erroneous in this judgment.

would be sufficient, authorizing the trier of fact to credit the accomplice's testimony even with respect to matters as to which there had been no corroboration. *McDowell v. State, supra,* at 213. Corroboration need not extend to every detail. *Brown v. State,* 210 Md. 301, 305 and cases there cited. So it is not necessary that in and of itself the corroborating evidence be sufficient to convict, and not much in the way of corroboration is required; only slight corroboration is necessary. The corroborating evidence may be circumstantial. *Nolan v. State,* 213 Md. 298, 309. "Whether the testimony of an accomplice has in fact been sufficiently corroborated must, of course, depend upon the facts and circumstances, and the inferences deducible therefrom, in each case." *Wright v. State, supra,* at 650.

There was evidence supplied by statements obtained by the police from non-accomplice witnesses, Jerome Parker and Wylie Jenkins, and received in evidence which tended to support some of the material facts of Watkins' testimony. They verified the relationship of Jones, Johnson and Daniels, they placed Jones, Johnson and Daniels together in the early morning hours of 19 July 1969 and they showed the three were in Daniels' yellow and black automobile about 3:00 a.m. on that date.[8] But Early was not mentioned by Parker or Jenkins and nothing in the statement of either provided the requisite corroboration by tending to show that Early was identified with Jones or Daniels[9] or that Early participated in the crimes

---

8. The substance of the statements was that Jones, Johnson and Daniels were homosexuals. Daniels and Johnson were living together but Daniels was seeing Jones "on the side." There was a party attended by about 25 of the boys the evening of 18 July. Johnson and Daniels arrived together about 11:00 p.m. but Daniels left shortly thereafter. He returned about an hour and a half later under circumstances which led Parker to believe he had been with Jones who arrived at the party five minutes later. Jones, Daniels, Johnson and Jenkins left the party in Daniels' yellow Malibu with a black top about 3:00 or 3:30 a.m. on 19 July. Jenkins left the car at North and Druid Hill Avenues.

9. By Watkins' testimony the actual participants in the murder were Early and Daniels as principals in the first degree and Jones as a principal in the second degree. Early was the admitted killer; Daniels was physically present at the crime scene with a common

themselves. In fact there was no evidence adduced other than Watkins' testimony to identify Early with the other principals in the crimes. Therefore if there were corroboration it would have to go to the participation of Early in the crimes themselves.

Officer Frederick Beckwith responded to a call to 209 Athol Gate Lane, Apartment B, about 1:45 p.m. on 19 July 1969. He was met by Daniels who said his roommate was dead. As the officer was conducted to a rear bedroom by Daniels, he observed that the house generally was in an orderly condition—"it was straight, it was neat." But in the bedroom Johnson was on his back in bed in a pool of blood. "He had multiple stab wounds all over his body." There was blood on the sheets and on the floor, but otherwise the room was not in disarray. The officer also observed "a spot of blood" on the kitchen floor and in the bathroom there was "some blood on the sink, the wash basin of the toilet." Beckwith called Homicide and the Crime Laboratory and waited for his Sergeant to arrive.[10]

Sergeant Fred Buckmaster was one of the police officers investigating the killing of Johnson. He arrested Early the latter part of July and took him to police headquarters. He saw a cut on Early's little finger. Photographs in color were taken of the hand and received in evidence. They showed that on the little finger of the left hand there was a partially healed laceration, crescent shaped and extending from the middle joint to the base of the finger. Buckmaster observed what appeared to be blood on Early's shoes. He submitted them to the Crime Laboratory. Its examination showed that there was hu-

---

intent; Jones waited outside the house in a position to lend aid and so was constructively present. *Sanders v. State,* 1 Md. App. 630, 646.

10. Daniels' actions pending the arrival of the other police officers resulted in his being arrested for "obstructing justice." Beckwith asked Daniels several times "not to bother anything" but Daniels "turned up the stereo" and continued "going around the house, started to touch things and * * * he continued and he started watering flowers and things like that." What happened as a result of this arrest is not disclosed in the record before us.

man blood on the left shoe, but it was insufficient for grouping. The shoes were received in evidence. The court noted that what appeared to Buckmaster to be blood on the left shoe was on the sole "generally in the area of the arch, at the very rear part of the tread and it is the size of a quarter." The evidence with respect to the cut on Early's finger and the human blood on his shoe considered in the light of the means by which the murder was committed—151 stab wounds—and of the blood on the bedroom and kitchen floors provided that slight corroboration, which is all that is required, tending to show Early's participation in the murder within the contemplation of the rule. We think, in the facts and circumstances here existent, it tended to establish such participation with "some degree of cogency" and so entitled the trier of fact to credit Watkins' testimony.[11] With Watkins' testimony the evidence was sufficient to sustain the convictions and we cannot say that the lower court's judgment thereon was clearly erroneous.

On cross-examination of Officer Beckwith defense counsel elicited that after the officer saw the body he asked Daniels what happened. Counsel asked what Daniels said. The officer started to reply and got as far as "He said that he had been to a party and he got home—" when the State's objection was sustained on the grounds of "hearsay." The defense then proceeded to bring out that Daniels had "interfered with [the Officer's] attempt to get information about the case", interfered with his "duties in trying to check the case out." See note 10 *supra.* Early now contends that the court erred in sustaining the objection. He alleges that what Daniels told the officer was admissible as part of the *res gestae.* There is nothing in the record here to show that whatever it was Daniels said in reply to the officer's question had the requisite spontaneity to constitute *res gestae.* On the

---

11. As pointed out *supra* Watkins said Early's finger was not cut when he saw him about 5:00 a.m. on 19 July but was cut when he saw him about noon when Early said that he had gone with Jones.

contrary the little disclosed of what Daniels said indicated the beginning of a narrative rather than a spontaneous and distinctive utterance, made without opportunity or time for reflection or deliberation. See *Harnish v. State,* 9 Md. App. 546; *Reckard v. State,* 2 Md. App. 312. We cannot say that the wide latitude of discretion given trial judges in determining the admissibility of evidence under the *res gestae* rule was here abused. *Hicks v. State,* 3 Md. App. 225. And in any event there was no proffer as to the content of the statement sought to be admitted. See *Gaylord v. State,* 2 Md. App. 571, 576. We hold the lower court did not err in sustaining the objection. Compare *Parker v. State,* 7 Md. App. 167; *Long v. State,* 3 Md. App. 638.

*Judgments affirmed.*