# PETER J. BORZA, III *v.* STATE OF MARYLAND

[No. 556, September Term, 1974.]

*Decided March 21, 1975.*

The cause was argued before MOYLAN, MENCHINE and LOWE, JJ.

*Geraldine K. Sweeney*, with whom were *Alan H. Murrell, Public Defender, Dennis M. Henderson* and *Frank Sacks, Assistant Public Defenders*, on the brief, for appellant.

*James G. Klair, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *Mark Van Bavel, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court. LOWE, J., dissents and filed a dissenting opinion at page 412 *infra*.

The appellant, Peter J. Borza, III, was convicted in the Criminal Court of Baltimore by a jury, presided over by Judge Albert L. Sklar, of statutory arson. Upon this appeal, he raises six contentions·

1. That the trial judge should have ruled that Joseph Credge was an accomplice as a matter of law and that there was insufficient evidence to corroborate his testimony;

2. That there was insufficient testimony from which the

jury could find that the accomplice's testimony was corroborated;

3. That the trial judge erred in refusing to give appellant's requested jury instructions;

4. That the trial judge committed reversible error in admitting prejudicial hearsay evidence;

5. That the trial judge erred in refusing to grant a mistrial; and

6. That the evidence was legally insufficient to sustain the convictions.

Because of our holding that the corroborative testimony was sufficient, even if Joseph Credge is assumed to be an accomplice, contentions one and two merge. Contention six may be dealt with along with them.

Late in the afternoon of Saturday, October 2, 1971, a fire occurred at the Castro Convertible furniture store at 315 North Howard Street in Baltimore. It was during business hours. The site of the fire was on the fifth floor, an area used for the storage of furniture. The business was one of three furniture stores in Maryland and New Jersey operated by the appellant, as franchisee of the Castro Convertible Company. The Harford Mutual Insurance Company paid $13,917.52 for damages to the store and $24,655.57 for damages to the contents. An accountant testified that as of June, 1971, three months earlier, the store was operating at a net loss of $104,000.

Captain John Richter of the Baltimore City Fire Department's Fire Investigation Bureau arrived at the fire scene at 5:05 p.m. He estimated that the fire had been burning about one hour when he arrived. The first alarm had been turned in at 4:36 p.m. by a parking lot attendant next door who saw smoke and flames coming from the building. Captain Richter could not fully ascertain the cause of the fire. He found a large pile of trash burning on the fifth floor. The fire had also spread to the sixth floor. He effectively eliminated electrical or heating fixtures as a cause of the fire. He could not eliminate spontaneous combustion, noting that the source of possible combustion

would have been consumed in the fire. He surmised that the fire probably resulted from careless smoking. He did interview the employee who had worked on the fifth floor that day, however. That employee was not a smoker, and he had not been in the store after 12:30 p.m. that day.

The testimony of the assumed accomplice now comes into play. Joseph Credge first became acquainted with the appellant in 1967. He was later employed by the appellant as a salesman in his Trenton, New Jersey, store. Credge later worked as general manager of both the Trenton store and the Baltimore store. In 1971, Credge and the appellant became partners in the Trenton store.

Credge testified that the Baltimore store was losing money and that in April or May of 1971, he and the appellant began discussions as to how to dispose of it. They finally determined to burn the Baltimore store. It was agreed that one or the other of them would go to the fifth floor of the Baltimore store and set fire to the packing materials and rubbish which were usually piled there awaiting disposal. On two occasions, on two successive Saturdays in September, 1971, Credge traveled from Trenton to Baltimore to set the fire. On both occasions, he abandoned the attempt because of fear. On the night of Friday, October 1, 1971, the appellant told Credge that he was going to Baltimore the next day and would set the fire if the opportunity presented itself. As a signal to the appellant upon his return to Trenton that the mission had succeeded, Credge was to leave the lights on in the Trenton store if word came in from Baltimore that the store had caught fire. Late on the afternoon of October 2, Credge, in Trenton, received a telephone call from the manager of the Baltimore store informing him that the store had caught fire.

The corroboration of Credge's testimony came largely from three employees of the Baltimore store. John Martin, the manager of appellant's Towson store, received a call from the appellant on the morning of October 2. The appellant informed Martin that he was taking a train in from Trenton and asked to be picked up at Pennsylvania

Station. Martin picked him up at the station at between 3:30 and 4:00 p.m. and drove him immediately to the Howard Street store. The appellant spent a few minutes on the first floor talking to various employees. A customer came in, and the appellant took him upstairs. The employees assumed that the two were going to a second floor showroom. They were not certain whether the appellant returned to the first floor simultaneously with the customer. All that was certain was that the appellant was out of their sight on some upper floor. The appellant returned to the first floor about fifteen minutes after he had left it and within several minutes told Martin that he had to catch a train. They immediately departed. Martin dropped the appellant at Pennsylvania Station "at most one hour" from the time he picked him up. Martin was just three blocks away from the station when he heard on his car radio about the store fire on Howard Street. He returned there immediately. The appellant took the stand and acknowledged the account of his visit to Baltimore as given by the three employees.

We have no difficulty whatsoever in holding that the testimony of the assumed accomplice was amply corroborated. The test with respect to corroboration was well stated by Chief Judge Orth in *Early v. State*, 13 Md. App. 182, 282 A. 2d 154, at 191-192:

> " ' "Corroborate" means to strengthen, not necessarily the proof of any particular fact to which an accomplice has testified, but the probative, criminating force of his testimony.' *Wright v. State*, 219 Md. 643, 649, quoting with approval 1 Underhill *Criminal Evidence* (5th ed. 1956) § 185. It is settled that *the corroborative evidence must tend* either: (1) to identify the defendant with the perpetrators of the crime, or (2) *to show the defendant's participation in the crime itself. Foxwell v. State, supra; Spies v. State*, 8 Md. App. 160. If with some degree of cogency it tends to establish either of these matters it would be sufficient, authorizing the trier of fact to credit the accomplice's testimony

even with respect to matters as to which there had been no corroboration. *McDowell v. State, supra,* at 213. *Corroboration need not extend to every detail. Brown v. State,* 210 Md. 301, 305 and cases there cited. So *it is not necessary that in and of itself the corroborating evidence be sufficient to convict,* and *not much in the way of corroboration is required; only slight corroboration is necessary. The corroborating evidence may be circumstantial. Nolan v. State,* 213 Md. 298, 309. 'Whether the testimony of an accomplice has in fact been sufficiently corroborated must, of course, depend upon the facts and circumstances, and the inferences deducible therefrom, in each case.' *Wright v. State, supra,* at 650." (Emphasis added)

The foregoing would also be dispositive of the appellant's sixth contention that the evidence was legally insufficient to permit the case to go to the jury, but for an added fillip in that regard. The fourth count charged specifically that certain merchandise, to the detriment of the defrauded insurance company, was "set fire to and burn[ed]." The fire investigator testified that the literal damage to the furniture was from its being "smudged from smoke and heat" and "water damage." Art. 27, Sec. 9 reads, in pertinent part:

"*Any person who wilfully and with intent to* injure or *defraud the insurer sets fire to or burns* or causes to be burned or who aids, counsels or procures the burning of *any goods, wares, merchandise or other chattels or personal property of any kind,* or of the property of himself or of another, *which shall at the time be insured by any person or corporation against loss or damage by fire;* shall upon conviction thereof, be sentenced to the penitentiary for not more than five (5) years." (Emphasis added)

It is clear to us that the gravamen of the offense is defrauding the insurance company by damaging goods through the agency of fire. That the literal damage comes

from the heat of the fire, from the smoke of the fire, or from the water of the firemen's hoses, rather than through the chemical process of combustion, is not controlling. To hold otherwise is to make an absurdity of the law. The employment of the phrase "sets fire to" as an alternative *actus reus* to "burns" frees this law from ancient rigidity of the arson laws when it comes to the term "burn." *Cochrane v. State,* 6 Md. 400 (1854), holds that there is a difference between the two terms and cites with approval the Virginia case of *Howell v. Commonwealth,* 5 Grattan 664. That case states, at 670-671:

> "We are not satisfied that *setting fire to* and *burning,* have been established by any legal authority to be synonymes, so as to justify, in an indictment upon the statute, the substitution of the former words in the place of the other. *East,* (2 Cr.L. 1020, § 2) remarking upon the statute 9 Geo. i. ch. 22, says, that that statute does, indeed, in enacting the felony, make use of the words 'set fire to', but he was not aware of any decision which had put a larger construction on those words than prevails by the rule of the common law; and the contrary opinion may be collected (he says) from what is said in *Spalding's* Case (1 Leach 218), and *Breeme's* Case, (1 Leach 220) and in the case of *Sarah Taylor,* (1 Leach 49). With all the respect which is justly due to this writer, upon an attentive inspection of the authorities which he has referred to, it will be discovered that there is nothing in these cases which decides that these expressions are identical in their meaning. The same author, in a subsequent section, (§ 11) says, that at common law, it was necessary to state an actual burning, but that the statute 9 Geo. i. ch. 22, using the term '*set fire to*' the house, it is now become common to state both, though (as he says) in effect meaning the same thing. (2 East 1033). But yet in *Salmon's* Case, Russ. & Ry. C. C. 26, (which was a

prosecution under this statute, for setting fire to a hay stack), it was moved to arrest the judgment, on the ground that it was not averred in the indictment, that by reason of setting on fire, the stack of hay was burnt and consumed; and the point being reserved, the Judges were of opinion that the conviction was right — *that it was not necessary the stack should be burned, the words of the act being 'set fire to'.* (2 Bagg. Cr. L. 79). This authority seems clearly to decide that *setting fire to* and *burning* are not legal synonymes. If they were, there would be no reason for that redundancy of language which is usual in the indictments under the stat. 9 Geo. i., according to the forms, laying burning as well as setting fire to. (See 3 Chit. Cr. L. 1109-1115). In the statutory offences of arson, enacted in the 2d and 3d sections of our statute, 1 Rev. Code, ch. 160, the offences are described 'burn or set fire to'; but in the 4th section, under which it is that the present indictment is laid, the expression is 'burn' alone. The change in the phraseology would seem to intimate on the part of the Legislature that there was a difference in the meaning. It is not, therefore, without reason, that *Mr. Davis,* in his work on Criminal Law, regarded the difference in the language as distinguishing between *burning* and *setting fire to.* (Davis' Cr. L. 117, see note q.)"

The dissent raises an issue not raised by the appellant, unless arguably done so under the broad and undifferentiated umbrella of charging that the evidence was legally insufficient to permit the case to go to the jury. Out of chance phrases in *McDowell v. State,* 231 Md. 205, 189 A. 2d 611, and *Bollinger v. State,* 208 Md. 298, 117 A. 2d 913, the dissent spins the theory that the *corpus delicti* of arson may never be established by evidence which goes to show criminal agency. Because an uncritical reading of dicta in *Bollinger* might give rise to such a misperception in others, it may be well to try to lay the ghost to rest.

In *McDowell*, the critical question was whether the testimony of an accomplice had been adequately corroborated. The court held that it had, and the conviction for arson was affirmed. Preliminarily, the court did recite the facts of the case and did set forth the uncontested fact that the *corpus delicti* of arson had there been established.[1] It then quoted *Wharton* [1 *Wharton's Criminal Evidence* (12th ed., Anderson, 1955) § 17, at 48] to the effect that "[p]roof of the defendant's connection with the crime as the operative agent, although essential for conviction, is not part of the corpus delicti." The court in *McDowell* was not remotely considering the question for which the dissent cites *McDowell* as authority — that of whether evidence of criminal agency may be used to prove the *corpus delicti*. The *McDowell* court was simply clearing the arena of the undisputed issues before coming to grips with the issue in that case — whether the testimony of the accomplice establishing the criminal agency of McDowell was adequately corroborated. That court was in effect saying, "The *corpus delicti* is not in dispute, but the mere establishment of the *corpus delicti* does not establish the criminal agency of the defendant. We now turn to the question of criminal agency generally and to the corroboration of the accomplice specifically." Indeed, a quick glance at the quoted *Wharton* makes it clear that that authority was not there considering any question dealing either with arson law or with whether an item that may go to show criminal agency may also go to show a particular element of a particular crime. In the general introduction, rather, to the concepts dealt with in the criminal law, *Wharton* was attempting to define and to distinguish the notion of *corpus delicti* from the notion of criminal agency.

Indeed, a moment's reflection on the proposition urged by the dissent — that each and every element of the *corpus delicti* must be established totally independently of proof

---

1. It is interesting to note for present purposes that the court found relevant in proving the *corpus delicti* of arson the fact that a captain of the Fire Investigation Bureau was able to eliminate spontaneous combustion or faulty wiring as possible causes of the fire.

tending to show criminal agency — will supply its own refutation. Whereas the *actus reus* may conceivably be established by independent proof not going to the criminal agency of anyone, a *mens rea*—general or special—is also a necessary element of the body of a crime. *Mens rea*, by definition, exists in the head of the perpetrator and not in a vacuum. Arson, moreover, is a crime having as one of its elements the special *mens rea* that the act of burning shall have been "willful and malicious." This specific intent of willfulness and malice must have existed in the brain of him who burned or him who procured the burning. Proof, therefore, of this particular mental element of the crime is, *ipso facto*, proof of criminal agency. It cannot be otherwise.

*McDowell* is also instructive on the further point of what is independent evidence tending to corroborate the testimony of an accomplice. In *McDowell*, an apartment was burned. The defendant was a subtenant enjoying residential privileges through January 3, 1962, the day of the fire. His presence in the apartment house, like the presence of the present appellant in the Howard Street store, was, therefore, not remarkable. Notwithstanding the relative innocuousness of such presence, standing alone, that presence was nevertheless held to be independent evidence corroborating the accomplice's testimony.

The *McDowell* court also considered as independent, corroborative evidence, the inference of a motive arising out of the fact that the defendant was being ejected from the apartment. Further evidence of motive came from the mouth of the accomplice, but the inference was held to be corroborative.[2] In the present case also, direct testimony as

---

2. The origin of the rule requiring corroboration of an accomplice's testimony is well traced in *Wright v. State*, 219 Md. 643, 150 A. 2d 733. That case also illustrated how corroborative evidence need not itself be evidence of unlawful conduct. This aspect of *Wright* was summarized in *McDowell*, at 231 Md. 212:

"The *Wright* case like the instant case, involved a conviction for arson based upon the testimony of accomplices. The opinion enumerates various items of evidence corroborative of the accomplices' testimony. A number of them concerned matters not in themselves unlawful and some were described as corroborating

to motive came from the accomplice Credge. The fact of the insurance being carried on the appellant's business and the independently established fact that that business had been operating at a net loss of over $100,000 during the months immediately preceding the fire certainly give rise to an inference of motive as forcefully as did the ejectment by a landlord in *McDowell*. In referring to these two independent items of evidence, *McDowell* said, *passim*, at 231 Md. 212-214:

> "Here the evidence of McDowell's presence, of his having to leave the apartment, and of his being the last person shown to have been in the immediate vicinity of the scene of the crime with both the opportunity and a possible motive to commit the offense serves as corroboration of the identification of the defendant with the commission of the crime, which is the other branch of the *Polansky* rule.
>
> . . .
>
> In an arson case the presence of the defendant in the vicinity of the fire, whether before or after its occurrence, is always relevant. *Bollinger v. State, supra*, 208 Md., at 307. . . . As to both presence and motive the defendant's testimony corroborates that of the accomplice. He was in the immediate vicinity of the fire shortly before it was set, and he was being put out of the apartment along with Aldrich.
>
> The defendant's presence near the scene of the fire was also corroborated by the independent witness, the plumber . . .
>
> . . .

---

'only the fact that the defendant had engaged in several lawful pastimes — such as going to the movies, eating watermelon and roaming the highways and byways late at night,' yet these were held (citing *Polansky v. State, supra*) to afford corroboration as showing 'that the defendant was identified with the admitted arsonists.' "

> The most important corroborative evidence we think consists of that which (1) shows McDowell's presence, (2) suggests a motive for setting the fire, and (3) shows that Aldrich departed from the scene when the fire occurred, leaving McDowell at the scene. . . . At that time the appellant had ready access to the place where the fire soon afterwards appeared."

Nor will *Bollinger*, under close examination, support the theory erected upon it. It is important to put *Bollinger* in perspective.

The barn burning, on which the conviction in *Bollinger* was had, occurred on December 16, 1954. Both defendants gave formal confessions to the State Police. The heart of the defense contention was that "the court erred in admitting the confessions before the State had overcome the legal presumption that the fire was not a criminal fire and before the State had proved the *corpus delicti* which they claim the State had never been able to prove." 208 Md. at 303. The central issue was the order of proof — the question of whether the State could offer the defendants' confessions before the *corpus delicti* had been shown. The Court of Appeals there held that there was no error in the *Bollinger* case and they affirmed the conviction. The Court adhered to the general truism that a confession of crime alone will not sustain a conviction and that, ordinarily, the confession should not be the first item of the State's proof. In retaining flexibility in application of the principle, however, the *Bollinger* court cited *Weller v. State*, 150 Md. 278, 132 A. 624, to the effect that an extrajudicial confession is not admissible "unless there then exists, *or there is a proffer of proof later*" of the *corpus delicti*. (Emphasis supplied) It went on to cite *Harris v. State*, 182 Md. 27, 31 A. 2d 609, for the proposition that the order in which the evidence should be produced "is largely a matter within the discretion of the trial court."

The court set out the defense thesis and the applicable law, at 208 Md. 304:

"Appellants further argue that without proof of the *corpus delicti* the confessions were not admissible. It is stated in *Wharton's Criminal Law*, 12th Ed., Vol. II, Section 1063, as follows: 'The burden is on the state to show that the burning was with a criminal design, — this is the *corpus delicti*. The *corpus delicti* cannot be established by proof of the burning alone, or by the naked confession of the accused. Where nothing except the burning appears, the law presumes it to have been accidental, and not by criminal design; and the state must overcome this presumption of law, and prove a criminal design beyond a reasonable doubt."

It is easy to see where the dissent was logically ensnared, because the passage in *Wharton,* cited with apparent approval by *Bollinger,* is a model of poor exposition. It joins in a single sentence — "The *corpus delicti* cannot be established by proof of the burning alone, or by the naked confession of the accused." — two very disparate propositions, without so much as a break of paragraph or even a period to make them twain. That freakish accident of murky exposition cannot give birth to the notion that the *corpus delicti* of an arson cannot be proved by *the combination of* proof of burning *and* the confession of the accused.

As to the first proposition, *Wharton* reiterates the universally accepted truth that the confession of a crime cannot, standing alone, warrant a conviction, absent some independent evidence of the *corpus delicti*. The thrust of the principle is to prevent mentally unstable persons from confessing to, and being convicted of, crimes that never occurred. *Bollinger* makes clear that it is this general principle — and not some rule peculiar to arson cases — that is being discussed. "Apparently there is no difference in this rule as applied to arson than in other criminal cases." 208 Md. at 304. "There is no question that in this State an extra-judicial confession of guilt by a person accused of crime uncorroborated by other evidence is not sufficient to

warrant a conviction." *Id.* at 304-305. "Generally an uncorroborated confession does not establish as a matter of law the commission of crime beyond a reasonable doubt. The purpose of the rule requiring corroboration of confessions is to guard against convictions based upon untrue confessions alone." *Id.* at 305. All of the cases cited by *Bollinger* make it clear that it is the general truism being discussed, and not some peculiarity of the arson law. *Weller v. State, supra* (where the crime was the manufacture of bootleg whiskey); *Gatewood v. State,* 207 Md. 374, 377, 114 A. 2d 619, 620 (where the crime in issue was a lottery violation); *Markley v. State,* 173 Md. 309, 196 A. 95 (where the crime was conspiracy to defraud); *Jones v. State,* 188 Md. 263, 52 A. 2d 484 (where the crime was murder).

*Bollinger* makes it very clear, in discussing specifically the proof of the *corpus delicti* itself, that a confession may well be one of the factors entering into that equation. It said, at 208 Md. 305-306:

> "It is also not necessary that the evidence independent of the confession must be full and positive. . . . In addition, the evidence necessary to corroborate a confession need not establish the *corpus delicti* beyond a reasonable doubt. *It is sufficient if, when considered in connection with the confession, it satisfies the jury beyond a reasonable doubt that the crime was committed and that the defendant committed it.* As Judge Learned Hand said in *Daeche v. United States,* 2 Cir., 250 F. 566, 571, circumstances corroborating a confession need not independently establish the truth of the *corpus delicti* at all, either beyond a reasonable doubt or by a preponderance of proof, *but any such circumstances will serve which in the judge's opinion go to fortify the truth of the confession. United States v. Kertess,* 2 Cir., 139 F. 2d 923, 929.
>
> Of course, proof of the *corpus delicti* in an arson case is usually a difficult matter, as the burning is

almost invariably done in a most secretive manner. The prosecution usually has to depend on circumstantial evidence. *State v. Edwards,* 173 S. C. 161, 175 S. E. 277, 278. It was said in *Ercoli v. United States,* 131 F. 2d 354: 'It is sufficient if there is substantial evidence of the *corpus delicti,* independent of the confession and the two together are convincing beyond a reasonable doubt.' For other cases holding that evidence of the *corpus delicti* and the confession may be considered together in determining the guilt of the accused see *Jones v. State, supra; Wood v. State, supra; Davis v. State, supra; State v. Traufer,* 109 Mont. 275, 97 P. 2d 336; *Ryan v. United States,* 99 F. 2d 864; *Arthur v. State,* 19 Ala. App. 311, 97 So. 158."

As to the second and very distinct proposition, *Wharton* is simply pointing out that one of the elements of the crime of arson, which needs be proved by the State, is the special *mens rea* that the burning be "willful and malicious." Again, however, the ill-advised language of *Wharton* has led latter-day readers astray, particularly where *Wharton* said:

"Where nothing except the burning appears, the law presumes it to have been accidental, and not by criminal design; and the state must overcome this presumption of law, and prove a criminal design beyond a reasonable doubt."

This, of course, is not a presumption of law. It is simply a statement that the State has the burden of proving all elements of a crime. A legal presumption has the effect of shifting to an opponent the burden of going forward and producing evidence. 9 *Wigmore on Evidence* (3rd ed. 1940) § 2490, "Presumptions." No burden, of course, shifted to the State in this instance, since the State had the burden from the very outset. This is one more instance of the word presumption having too many meanings. The presumption referred to here, like the so-called presumption of innocence, is neither a true presumption of law nor an inference of fact,

but a statement as to the burden of proof. The State has the burden of proving the special *mens rea* in an arson case beyond a reasonable doubt, just as it has the burden of so proving every other element of this or any other offense. Indeed, later editions of Wharton have now refrained from this loose use of the word "presumption." 2 *Wharton's Criminal Law and Procedure* (Anderson Edition, 1957) now describes, in dealing with arson, the mental state at § 390:

> "In the absence of contrary evidence, it is assumed that every burning is accidental or is due to natural causes, and not criminal design. The burden is, accordingly, on the prosecution to establish that it was wilful and malicious. Because of this, the corpus delicti is not established by proof of burning alone, since such fact does not prove the intent with which the act was done."

We note, moreover, that the words of the appellant at issue in this case were operative words of the then ongoing conspiracy spoken by the appellant to Credge and were not a confession within the contemplation of *Bollinger*. *Bollinger*, indeed, even considered the post-crime blurt, "I did it" made to a policeman as outside its notion of "confession," which it restricted to a response to a formal custodial interrogation.

*Bollinger* lends further support to our holding that there was in this case ample independent evidence to corroborate the testimony of an assumed accomplice. The defendants in *Bollinger* lived on a neighboring farm and regularly frequented a nearby store. Their presence, like the presence of the appellant here at the North Howard Street store, was, therefore, unremarkable. Nonetheless, such presence near the scene of the crime was held to be independent evidence of guilt:

> "Appellants arrived in a car at the store two miles distant from the fire about twenty-five to thirty minutes after Mr. Keilholtz saw the small fire and from ten to twenty minutes after Mr. Valentine testified that the barn was ready to explode. In

arson cases, evidence that the accused was seen in the vicinity of the fire, whether before or after it occurred, is always relevant. It is said in *Underhill on Criminal Evidence,* 3rd Ed., page 798, Section 564: 'It is always relevant, particularly in the case of the crime of arson, which is usually committed at night and with the greatest secrecy, to show that the accused was seen in the vicinity of the burned building about the time of the fire, whether before or after it occurred.' " 208 Md. at 307.

Curiously apposite also in the *Bollinger* case was that the court there found relevant to the establishment of the *corpus delicti* the facts that the barn owners had been present in their barn a little more than an hour before the fire occurred, that neither of the owners smoked, and that the barn had recently been wired by an electrician and the wiring was apparently all right.

The appellant's third contention is that he was erroneously denied the following requested instruction:

"The Court instructs the jury that to constitute the offense of arson it is necessary that the burning be wilful and malicious. In the absence of contrary evidence it is assumed that every burning is accidental or due to natural causes and not criminal design. The burden is, accordingly, on the prosecution to establish that it was wilful and malicious. Because of this the corpus delicti is not established by proof of the burning alone, since such fact does not prove the intent with which the act was done."

There was, to be sure, nothing improper about the requested instruction. *Hughes v. State,* 6 Md. App. 389, 251 A. 2d 373. The adequacy of the instructions is determined, however, by viewing them as a whole. *State v. Foster,* 263 Md. 388, 283 A. 2d 411; *Shotkosky v. State,* 8 Md. App. 492, 261 A. 2d 171. The trial court's discretion as to wording, order and amount of detail in his instructions should not be disturbed on

appeal absent a clear abuse of that discretion. *Mills v. State,*
12 Md. App. 449, 279 A. 2d 473. The judge charged the jury
that the burden of proof was upon the State to establish
every element of the crime charged and that the appellant
was presumed innocent until proved guilty beyond a
reasonable doubt. The jury was instructed that the appellant
was entitled to every inference that could reasonably be
drawn in his favor from the evidence. The instructions went
on:

"You are instructed that the crime charged by
the State, the crime of arson, requires proof beyond
a reasonable doubt of specific intent on the part of
the defendant of specific intent before the
defendant can be convicted. To establish specific
intent, the State must prove that the defendant
knowingly did an act which the law forbids
purposely intending to violate the law; or that he
wantonly and recklessly disregarded the law.

If a man does an unlawful act, the natural
tendency of which is to set fire to and burn a
building, and such consequences follow, the
burning is to be regarded as intentional and
malicious. In that regard, you are advised that to
constitute the offense of arson, it is necessary that
the burning be willful and malicious. The burden is
upon the State to establish beyond a reasonable
doubt that it was willful and malicious."

Setting down the nubs of the instruction requested and
the instruction given side by side, it is clear that the
difference is only stylistic.

|  *Instruction*  |  *Instruction*  |
|  *Requested*  |  *Given*  |
| "[I]t is necessary that the burning be wilful and malicious. In the | "In that regard, you are advised that to consti- tute the offense of ar- |

| Instruction Requested | Instruction Given |
|---|---|
| absence of contrary evidence it is assumed that every burning is accidental or due to natural causes and not criminal design. The burden is, accordingly, on the prosecution to establish that it was wilful and malicious." | son, it is necessary that the burning be willful and malicious. The burden is upon the State to establish beyond a reasonable doubt that it was willful and malicious." |

Every essential point of law was properly covered. That is all we ask of instructions. *Harris v. State*, 11 Md. App. 658, 276 A. 2d 406.

The appellant, in his fourth contention, claims that certain testimony by F.B.I. Agent Arthur Hall was hearsay. It was not hearsay. After Credge returned from his second aborted fire-setting trip to Baltimore in September, 1971, he telephoned Agent Hall in Trenton and both confessed his own involvement up to that time and indicated the likelihood that the appellant would go forward with the planned arson. Credge indicated that he wanted to notify the authorities. Agent Hall consulted his supervisor and called Credge back, informing him that it was not an F.B.I. matter. The agent advised Credge to notify the Baltimore authorities, which Credge did not do. The F.B.I. did not follow through either. At the trial, the issue of whether Credge was still an accomplice on the critical date of October 2, 1971, or whether he had by that time abandoned the conspiracy was a focal issue. The F.B.I. agent was called by the State and recounted the conversation he had with Credge in September, 1971. On the issue of abandonment, the conversation of Credge with the F.B.I. was not hearsay but an operative verbal act. A disclosure to police authorities is an indication of

abandonment of the criminal purpose. The out-of-court statement of Credge to the F.B.I., therefore, was not offered for the truth of the thing asserted (which would be hearsay) but rather for the verbal act of the asserting. See 29 Am.Jur.2d, *Evidence,* § 497, "What Constitutes Hearsay Within Exclusionary Rule, In General," p. 555:

> "The hearsay rule, however, does not operate, even apart from its exceptions, to render inadmissible every statement repeated by a witness as made by another person. It does not exclude evidence offered to prove the fact that a statement was made or a conversation was had, rather than the truth of what was said. Where the mere fact that a statement was made or a conversation was had is independently relevant, regardless of its truth or falsity, such evidence is admissible as a verbal act."

The statement was, moreover, admissible in serving another function. After Credge's abortive attempt to notify the proper authorities, he remained silent for over two years. Both his motives and his credibility were attacked and significantly impeached on cross-examination. The inference was pregnant that Credge's story two years after the fact was a malicious and fabricated afterthought. The prior consistent statement, made over two years earlier, was significantly rehabilitative of that damaged credibility, which is a recognized function of a prior consistent statement. The out-of-court statement, in that regard, is offered not for the truth of the thing asserted but rather to show that what was asserted then is the same as what is being asserted now. *Harris v. State,* 11 Md. App. at 660-662; 58 Am. Jur., *Witnesses,* § 828; 98 C.J.S., *Witnesses,* § 648 a (3).

The appellant's fifth contention is that the trial judge erroneously denied his motion for a mistrial. The motion came during the cross-examination of the appellant:

> "Q. When did you get rid of that store? [The store in Trenton]

A. I didn't get rid of it, the court did, or the people — I don't know what you're speaking of, exactly, how did I get rid of it; it was in bankruptcy.

Q. Wasn't it a fact that that store was destroyed also?

MR. SACKS (Defense Counsel): Objection, Your Honor.

THE COURT: I'll have to sustain that. I do not know what you mean by destroy.

MR. VAN BAVEL (Assistant State's Attorney): Isn't it a fact that that store blew up?

MR. SACKS: Objection, Your Honor."

A hurried bench conference was called. The prosecutor proffered information that the appellant's Trenton store had been destroyed in April, 1972, by an explosion of undetermined cause, at least showing good faith on the part of the prosecutor if not total discretion. The wisdom of long experience has taught us to place confidence in the trial judge on the scene to exercise his sound discretion as to whether a mistrial should or should not be granted. He is in the unique position to gauge the effect of a remark upon the people under his observation. Mistrials should not be granted except under urgent circumstances and with the greatest caution. *Baldwin v. State*, 5 Md. App. 22, 245 A. 2d 98; *Reeves v. State*, 3 Md. App. 195, 238 A. 2d 307; *Gerstein v. State*, 10 Md. App. 322, 270 A. 2d 331. The judge denied the motion and immediately gave the following curative instruction:

"Members of the jury, I want to advise you to disregard any references made here to any other store. It has nothing whatsoever to do with this case. We know nothing about any other store, and if we did, it would have nothing whatever to do with this case. So, please disregard any reference or discussion concerning any other store's liquidation.

I do not know whether or not there was any liquidation. Just disregard that completely."

We cannot say that his discretion was abused.

*Judgments affirmed; costs to be paid by appellant.*

*Lowe, J., dissenting:*

I must respectfully depart from the majority because it is obvious to me that the State failed to meet its burden.

*Borza was convicted solely* upon the testimony of his accomplice, Credge, who, after a homosexual affair with Borza had been rejected by him in preference for a more natural relationship with one of the opposite sex. The testimony was gratuitously volunteered after two years of silence following the fire. Suffice to say, Credge was not a reluctant witness. More than that, his testimony at most established only that he and appellant had discussed burning the store the preceding April or May, that he, Credge, had twice traveled to Baltimore in September to burn the store, and that on the night before the fire, appellant had mentioned that he might set fire to the store. This factual posture presented at least four possibilities:

1. that Credge told the truth and appellant wilfully and maliciously set fire to the store;
2. that Credge told the truth but that the fire was accidental and Credge wrongfully deduced appellant's guilt;
3. that Credge lied about the previous conversations;
4. that Credge himself set the fire knowing appellant would be in the store that day.

I recognize, of course, that fact-finding is left to the jury. The majority, however, inexplicably fails to recognize that it is for that reason the courts have engrafted on the fact-finding process certain fundamental legal protections

for a criminal accused. To insure that the second hypothesis is not the case, the State must prove the substantial fact that a crime has been committed, the *corpus delicti*:

> "The burden is on the state to show that the burning was with a criminal design, — this is the *corpus delicti.* The *corpus delicti* cannot be established by proof of the burning alone, or by the naked confession of the accused. Where nothing except the burning appears, the law presumes it to have been accidental, and not by criminal design; and the state must overcome this presumption of law, and prove a criminal design beyond a reasonable doubt." [Emphasis added]. *Bollinger v. State*, 208 Md. 298, 304, quoting 2 Wharton's *Criminal Law*, (12th Ed., Anderson) § 1063.

To minimize the possibility of the third and fourth hypotheses being the case, the State must introduce corroborative evidence when an accomplice testifies. The State totally failed in both regards.

Assuming Credge told the truth, his testimony did no more than establish that appellant was contemplating setting the fire, *not* that he set it. Had the State then proven that the fire was deliberately set — indicating a criminal act — the evidence may have been sufficient to convict. The State did just the opposite.

The only permissible evidence submitted by the State to meet its burden of overcoming the presumption of accident was that of Captain Richter of the Fire Investigation Bureau. From the majority's depiction of his testimony we are told:

> "Captain Richter could not fully ascertain the cause of the fire . . . .
>
> He could not eliminate spontaneous combustion . . . .
>
> He surmised that the fire probably resulted from careless smoking . . . ." although the employee on the fifth floor had been a nonsmoker.

Even though the Captain had "effectively eliminated electrical or heating fixtures as a cause of the fire" certainly his testimony seemed more to establish that the fire arose from natural or accidental cause than to establish a deliberate burning.

The majority has transformed evidence of criminal agency, *i.e.*, if there was a crime, appellant probably committed it, into evidence of agency and *corpus delicti*, *i.e.*, the fire was deliberately set and appellant set it. That is a leap of faith wholly unwarranted by the evidence and diametrically opposed to the Court of Appeals's clear and simple expression of the State's burden. In *McDowell v. State*, 231 Md. 205, 208 [1] Chief Judge Brune said:

> " 'As Wharton points out '[p]roof of the defendant's connection with the crime as the operative agent, although essential for conviction is not part of the *corpus delicti.*' " (Reference here is to 1 Wharton's *Criminal Evidence*, (12th Ed., Anderson 1955) § 17 at 48).[2]

The majority dismisses the requirement of independently proving the "actus reus", of arson simply because it is a crime requiring "a special mens rea" *i.e.*, proof of "wilful and malicious" intent. Because "mens rea" is also an element of criminal agency does not excuse the necessity of independently proving the act charged was a crime. "Where nothing except the burning appears, the law presumes it to have been accidental, and not by criminal design; and the State must overcome this presumption of law, and prove a criminal design beyond a reasonable doubt." *Bollinger*, 208

---

1. Recognizing that this was judicial dictum since that case focused on proof of criminal agency rather than the *corpus delicti*, it is not without precedent for this Court to adopt policy concepts in reliance upon Court of Appeals' dicta. *Cf.*, Transamerica Insurance Company v. Brohawn, 23 Md. App. 186.

2. The most recent edition of 1 Wharton's *Criminal Evidence* (13th Ed., Torcia 1972) § 17 at 27 reiterates the same concept:

> "Proof that the defendant was the person who engaged in the unlawful conduct is of course necessary for a conviction, but it is not an element of the corpus delicti."

Md. at 304. However you read that sentence, whether in or out of context, its clarity dispels the notion that it is a "freakish accident of murky exposition." It is not conceivable that the Court of Appeals meant that an accusation that a defendant discussed committing a crime, is sufficient to prove that a crime was committed. In laying their "ghost to rest" the majority may find themselves haunted by the apparition of a dormant *corpus delicti.*

Corroboration is the other fundamental legal protection that this case erodes. The only corroborative evidence of Credge's testimony was the presence of the accused in his own store on the day of the fire.[3] Significantly, this fact in no way detracts from either of the third and fourth exculpatory hypotheses suggested above.

The test for corroboration of an accomplice has been many times stated. In *Luery v. State,* 116 Md. 284 the Court wrote:

> "[T]he important matter is to have [the accomplice] supported in at least some of the material points involved . . . ."

In *Judy v. State,* 218 Md. 168, 176 the Court held that corroborating testimony "need only support some of the material points of the accomplice's testimony." [Both cited with approval in *McDowell v. State,* 231 Md. 205, 211-212].

Appellant's presence in his own store, though perhaps relevant, surely cannot be regarded as assuring Credge's verity by supporting "some of the material points" of his testimony. Presence of an accused may be adequate corroboration when it is "under unusual or suspicious circumstances." 3 Wharton, *Criminal Evidence* (Torcia Ed., 1973) § 649 at 368. But the presence of a furniture store owner at his own store can hardly be regarded as either unusual or suspicious. In that situation, mere presence is not sufficient corroboration. *Hatton v. Commonwealth,* 253 Ky. 103, 68 S.W.2d 780.

---

**3.** Although prior to the fire Credge contacted an FBI agent and told him about his and appellant's fire discussions, it would be the ultimate in tautological thinking to treat such self-serving groundwork — whether or not termed "operative verbal acts" — as corroboration.

The majority alludes at length to language in *McDowell* suggesting that presence was there a corroborative circumstance. With that narrow statement I have no quarrel. Non-accomplice testimony of the accused's presence took on special significance in *McDowell* because of the accused's statements which were "contradictory and untruthful . . . relating to his whereabouts at the time of the fire." The *McDowell* Court, relying on *Wright v. State*, 219 Md. 643, stressed the fact that the testimony of non-accomplice witnesses was consistent with that of the accomplice and inconsistent with that of the defendant. That is a circumstance conspicuously absent here.

The potentially vengeful motivations of appellant's lone accuser and the unexplained delay of two and one half years before he made the accusation create a most tenuous setting in which to undermine the safeguards provided by the requisites of proof of *corpus delicti* and corroboration. Strain we have and strain we should to meet a technical mischance in a case where guilt and culpability of the accused is otherwise readily apparent. But what meaning can we give to the platitudes upon which our system of justice is said to rely if we need strain so hard here, even to ascertain if a crime was committed. To permit a rejected homosexual paramour to supply that, plus every other element necessary for conviction, is to allow the accuser to make a mockery of our time-honored safeguards. In trying to stabilize the tenuous structure upon which this case is built, the majority has exacted another chip from the foundation structure of the system.