[Crim. No. 18499. In Bank. Jan. 29, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
GILBERT TEWKSBURY, Defendant and Appellant.

954

## COUNSEL

George H. Rhodes, under appointment by the Supreme Court, and Roger S. Hanson for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Donald F. Roeschke, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—Gilbert Tewksbury was convicted by a jury of first degree murder (Pen. Code, § 187) and two counts of first degree robbery (Pen. Code, § 211). He contends on appeal from the ensuing judgment that his convictions were unlawful in that they are supported only by the uncorroborated testimony of two witnesses who were as a matter of law accomplices.[1] He contends alternatively that the jury was improperly instructed that he had the burden of proving by a preponderance of the evidence that one of such witnesses was an accomplice. We conclude that neither of the foregoing nor other contentions can be sustained and we affirm the judgment.

In the early morning hours of December 24, 1970, two masked men armed with handguns robbed two employees of the El Torito Restaurant in Encino. The robbery occurred in a parking lot near the restaurant shortly before it closed. During the robbery one of the victims was fatally shot. The surviving victim was not able to identify his assailants.

Defendant's connection with the robberies and murder was established only by the testimony of two witnesses, Mary Pedraza and Sheila Twiford. Defendant lived in the home of Mary and her husband Mike

---

[1]Penal Code section 1111 provides that a "conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Unless otherwise specified all statutory references herein are to sections of the Penal Code.

Pedraza at the time of the charged crimes. Sheila Twiford was then defendant's girlfriend. On the day prior to the crimes she was employed as a cocktail waitress at the El Torito Restaurant. She left work around 9 that evening and went to the Pedraza residence to visit defendant. The Pedrazas were not then at home. As she talked to defendant about her job she mentioned how busy the restaurant had been. Defendant asked how much money she thought the restaurant had taken in and when she told him about $8,000 or $10,000 he replied that "he wanted to rob it." Defendant telephoned his friend Richard Eribes, told Eribes of his plans and asked him to join them. Defendant told Eribes to bring dark clothing, dark nylons, handkerchiefs, and tape.

Sometime between 10 and 11 p.m. Mary Pedraza had returned home. She was followed shortly thereafter by her husband Mike. Both Pedrazas were under the influence of drugs. It is not clear whether they arrived home before defendant had telephoned Eribes, but in any event Eribes was not present when they arrived. As Mary was busying herself about the house she overheard defendant and Sheila as they conversed but Mary paid no attention to the substance of the conversation. At Sheila's request Mary telephoned the El Torito Restaurant and was informed that the kitchen closed at 12 o'clock.

After Eribes arrived at the Pedraza residence he discussed plans with defendant and Sheila in a back room. The Pedrazas were in a different part of the house and did not participate in the discussion. Sheila used pencil and paper supplied by Mary to draw a diagram of the restaurant. She showed the diagram to defendant, Eribes, and Mary. According to Mary no one seemed to be able to understand the diagram, so she suggested to Sheila that she accompany defendant and Eribes to the restaurant so they might personally observe it. Sheila, however, stated she did not wish to do so.

Around midnight defendant and Eribes left for the restaurant in Eribes' car. Before leaving they told the others to meet them at a predetermined place near the restaurant in another car. Mary was at first reluctant to go but her husband urged her to join them "for the ride." Finally she agreed to go, partly because she wanted to get out of the house and partly because she thought her husband was too intoxicated to drive the second vehicle.

With Sheila giving directions Mary drove to the place where defendant and Sheila had planned to meet. After waiting for 20 to 25 minutes

defendant and Eribes approached in Eribes' car. Defendant stated that something had gone wrong, that Eribes had shot someone and that they would have to leave quickly. Defendant then left Eribes' car to join Sheila, forcing the Pedrazas to move to Eribes' car. On the way back to the Pedraza residence defendant related to Sheila what had occurred. He stated that while engaged in tying two restaurant employees outside the restaurant Eribes' gun had accidentally fired and that they fled without receipts from the restaurant. They had, however, taken a total of $480 from the two employees.

The two cars returned to the Pedraza residence where the money was divided. Each of the five parties received $100 except Sheila who received only $80. However, the two Pedrazas each gave $20 to Eribes and Sheila gave her entire $80 to defendant.

Defendant urged two defenses at trial. One was an alibi, and by the other defendant sought to establish that *both* Sheila and Mary, the only witnesses who connected defendant with the crimes, were accomplices whose testimony had to be corroborated pursuant to section 1111.[2] There is no question that Sheila was an accomplice and no challenge is made to the trial court's ruling to that effect. Sheila was initially charged with the murder and robberies and was held to answer at the preliminary hearing. In exchange for her testimony, however, the prosecutor agreed to allow her to plead guilty to a single charge of second degree robbery. The question of Mary's status as an accomplice is crucial, for if she is an accomplice then her testimony cannot be used to corroborate Sheila's testimony as the required corroboration must come from a source other than another accomplice. There is no other independent source of corroboration in the instant case.

Initially Mary was charged with the murder and robberies and was held to answer following a preliminary hearing. However no further proceedings had been undertaken against her at the time of defendant's trial. She at first asserted her right not to incriminate herself and refused to answer any questions as a witness at defendant's trial. She was thereafter granted immunity but she again refused to answer all but a few background questions for fear of incriminating her husband Mike. (See Evid. Code, § 970.) Although proceedings against Mike had been

---

[2] Eribes was charged with the murder and robberies and submitted the cause on the transcript of the preliminary hearing. He was convicted of second degree murder and refused to testify at defendant's trial. Mike Pedraza was charged with the crimes but not held to answer. He refused to testify at defendant's trial. Proceedings had against Sheila and Mary and the stands taken by them as witnesses will hereinafter appear.

dismissed and he was thereafter granted immunity, Mary nevertheless remained a very reluctant witness. She was once adjudged in contempt for refusing to testify but the court vacated its ruling when she finally indicated that she would cooperate. Nevertheless her testimony remained less than complete. She testified that she was "loaded" on "reds" on the night in question and neither was fully aware of nor remembered what had happened.[3] Each time Mary returned to the stand her memory improved and her testimony became increasingly detailed. Eventually she was able to corroborate Sheila's testimony that defendant was one of the two robbers. She also remembered receiving a share of the stolen money from either defendant or Sheila when they returned to her house after the robbery. Moreover she recanted somewhat her earlier testimony that she did not have knowledge of the intended robbery and that she did not actually realize that a robbery was to take place until Sheila told her about it while waiting in the car.

---

[3]Illustrative of Mary's evasiveness, when asked on cross-examination what her thoughts were as she was driving to the restaurant with her husband and Sheila, she responded in the following manner:

"A. I didn't think.

"
. . . . . . . . . . . .

"Q. Was anyone directing you to drive in a certain direction?

"A. Well, I guess Sheila was.

"Q. Well, specifically what do you recall Sheila told you?

"A. I don't know what she told me. I just—everything—I don't remember—really remember anything.

"
. . . . . . . . . . .

"Q. Well, did you feel apprehensive in any way. . .?

"A. Yes, I did.

"Q. Did you say anything about that to Miss [Sheila] Twiford?

"A. No, I didn't. I knew my husband knew, more or less, what—I don't know. I just—I just didn't—I wasn't thinking straight. I wasn't really caring about anything, I guess."

Her responses to other questions were as follows:

"Q. When was the first time you ever heard that there was a robbery involved in this case . . .?

"A. I really can't remember it because I was really loaded.

"
. . . . . . . . . . . .

"Q. What was the conversation that took place in that car?

"A. . . . I don't know. I just don't want to answer any more questions. I don't know what I am doing here really.

"
. . . . . . . . . . . . .

"Q. What did [Sheila] tell you the purpose of you three people sitting there was?

"A. I don't—well, we didn't—we were just talking then. We just really didn't—

"I don't know. I don't think we really made sense, any of us did, about anything."

Similarly when asked:

"Q. . . . did you receive $100 from the proceeds of the El Torito Restaurant robbery?

"A. (Pause) I don't know. I don't know if I can answer that.

"Q. . . . is that because you don't remember or because you refuse to answer it?

"A. No. Because it is a confused answer, and I just—I guess I would rather not."

■ "An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant . . . ." (§ 1111.) This definition includes all principals in a criminal act (i.e., "[a]ll persons concerned in the commission of a crime" (§ 31)) but does not include accessories (i.e., "[e]very person who, after a felony has been committed, harbors, conceals or aids a principal in such felony" (§ 32)). Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom. (See *People* v. *Hoover* (1974) 12 Cal.3d 875, 880 [117 Cal.Rptr. 672, 528 P.2d 760].) The fact that "the witness was prosecuted for the same offense as defendant does not alone establish her to be an accomplice [as a matter of law]." (*People* v. *Gordon* (1973) 10 Cal.3d 460, 467 [110 Cal.Rptr. 906, 516 P.2d 298].) ■ Thus Mary Pedraza is not necessarily an accomplice merely because she was held to answer for the same crimes as defendants and then granted immunity. Nor did she necessarily become an accomplice if it be deemed that she aided in the commission of the crimes. Criminal liability as a principal attaches to those who aid in the commission of a crime only if they also share in the criminal intent (§ 20; see also *Pinell* v. *Superior Court* (1965) 232 Cal.App.2d 284, 287 [42 Cal.Rptr. 676]) or, in the language of section 31, abet the crime.[4] Mary was thus an accomplice only if at the time she acted she had "guilty knowledge and intent with regard to the commission of the crime." (*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103].) Although it is undisputed that Mary aided appellant by calling the restaurant, by supplying Sheila with pencil and paper, and by driving some of the principals to a point of rendezvous in the vicinity of the crimes, such actions do not confer upon her accomplice status unless she also acted with the requisite guilty intent. She need not have actually had the specific intent to commit a robbery however; the intent requirement is satisfied if Mary, prior to its commission, realized that a robbery was being planned and that she was facilitating its commission. (*People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Germany* (1974) 42 Cal.App.3d 414, 420 [116 Cal.Rptr. 841].)

Defendant argues that Mary must have realized as a matter of law that she was aiding the commission of a robbery and must therefore have possessed the requisite guilty knowledge. Although the jury could have

---

[4]In *People* v. *Dole* (1898) 122 Cal. 486 [55 P. 581], it was held error to instruct that one who aids in a crime is guilty as a principal, as a principal is one who both aids *and* abets. The court stated: "The word 'aid' does not imply guilty knowledge or felonious intent, whereas the word 'abet' includes knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime." (*Id.*, at p. 492.)

reached that conclusion, the evidence, especially Mary's own testimony, was subject to conflicting inferences and would also have supported a finding that she did not have guilty knowledge.[5]

While Mary did at one point admit that she eventually realized defendant and Eribes were planning a robbery while at her home, she testified she was unaware of the details. In particular she did not know when the robbery was to take place, nor did she draw any connection between the activities of defendant and Eribes and her own actions including her subsequent departure from her house with her husband and Sheila. In fact she indicated a sense of relief when the two men left

[5]As noted, Mary testified that because of the drugs she had taken she was not fully aware of the activities of the other people in her home. With regard to her telephone call to the restaurant, for example, she testified on cross-examination as to her knowledge as follows:

"Q. Would you give us that conversation that you heard between [defendant and Sheila]?

"A. I don't—I don't remember all of the conversation, but they were discussing something about her job.

"Q. ... What were they discussing about her job?

"A. Sheila couldn't remember when the kitchen closed.
" . . . . . . . . . . . . . . . . .

"A. [She said] she didn't want to call because they would know—they would know her voice, I think, or something.
" . . . . . . . . . . . . . . . . .

"Q. Did you make a call?

"A. Yes.
" . . . . . . . . . . . . . . . . .

"A. I asked what time the kitchen was—what time the kitchen would be closed.
" . . . . . . . . . . . . . . . . .

"Q. ... did you have any belief or frame of mind as to why this information was of interest of Miss [Sheila] Twiford at that time?

"A. Well, then I thought they [defendant and Sheila] were going out to eat."

Similarly with respect to giving Sheila the pencil and paper she testified:

"A. ... I didn't pay any attention to what she was doing.

"Q. What were you doing at that time [after giving Sheila the pencil and paper]?

"A. ... watching TV.
" . . . . . . . . . . . . . . . . .

"Q. ... did Sheila ever do anything with that white piece of paper later on that evening as far as you know?

"A. Well, she asked me to look at it.

"Q. And did you in fact look at it?

"A. Yes.

"Q. And did you recognize anything about that white piece of paper?

"A. Well, it really wasn't anything to me except she was saying that it was the restaurant. ... I didn't pay attention to it.
" . . . . . . . . . . . . . . . . .

"A. ... I didn't look at the paper."

the house before her, feeling that her involvement with them had ended at that point.[6]

Thus Mary's testimony generally showed her to have been at least as reluctant a participant in the robbery as she was a witness. While her testimony did contain many inconsistencies, it was not wholly incapable of belief and we must on appeal resolve all inferences and inconsistencies in favor of the jury's implied finding that she was not an accomplice. So viewed her testimony does reasonably support the finding that she acted without guilty knowledge prior to the actual perpetration of the robbery and that she did not ever realize that she was aiding in its commission until after it had been accomplished and she heard Sheila talking about it while waiting in the car for defendant and Eribes.[7] The court thus did not err in failing to instruct that Mary was an accomplice as a matter of law.

 Defendant's alternative complaint of trial court error is grounded upon the court's instruction that defendant had the burden of proof to show by a preponderance of the evidence that Mary was an accomplice.[8] Defendant contends that the court should have instructed *sua sponte* (see *People* v. *Gordon, supra,* 10 Cal.3d 460) that the prosecution had the burden of proving that Mary was not an accomplice, either by proof beyond a reasonable doubt or at least by a preponderance of the evidence.

Defendant is initially confronted with the express provisions of the Evidence Code that a "party [i.e., defendant] claiming that a person [i.e.,

---

[6] Mary's testimony was as follows:

"Q. ... [D]id you know exactly what was going on or not?

"A. Well, I knew they were going to—they were going to rob someplace or do something. I knew it was a robbery. I just stayed out of it. I didn't take part in it then.

"... . . . . . . . . . . . . . . . .

"Q. After [Eribes] and [defendant] left the house, did you know at that time that you were going to follow their car to the scene of the robbery?

"A. No.

"Q. So as far as you knew, they had just gone to commit the robbery and you were out of it at that time. Is that correct?

"A. Yes."

[7] Defendant does not contend and it does not appear that accomplice status could be imputed to Mary on the ground that because the perpetrators of the crimes had not yet made their escape the crimes were still in progress when they met Mary at the rendezvous point. Her conduct thereafter with knowledge of the crimes would, at most, constitute her being an accessory after the fact. (§ 32.)

[8] Defendant requested such an instruction. Although the court did not give the precise instruction requested, the instruction given was almost identical to that requested. Defendant nevertheless complains of the invited error. As we hereinafter conclude that defendant must bear the burden of proof, we need not reach the invited error issue.

Mary] is guilty of crime or wrongdoing has the burden of proof on that issue." (Evid. Code, § 520; see also Evid. Code, § 500.) Consistent with this allocation of the burden of proof it is uniformly held that the defense initially bears the burden of producing evidence to raise the accomplice issue (Evid. Code, § 550) and that in the absence of any such proof the witness is treated as not being an accomplice. (7 Wigmore on Evidence (3d ed.) § 2060; *People v. Johnson* (1971) 18 Cal.App.3d 458, 463-464 [95 Cal.Rptr. 316, 96 Cal.Rptr. 695]; see also *People v. Hoover, supra,* 12 Cal.3d 875, 882-883; *People v. Waller* (1939) 14 Cal.2d 693, 702-703 [96 P.2d 344].)

The placement of the burden of proof of accomplice status on the defendant claiming such status on the part of a witness does not, however, resolve the more difficult question by what standard the burden *is to be discharged,* for the burden of proof could require that the defendant "raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." (Evid. Code, § 115; see also Evid. Code, § 502.) The general rule is that "[e]xcept as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115.)

An important exception exists, however, in criminal cases as to the proof of all elements of the crime or crimes charged. ■ Thus when there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People, the accused need only raise a reasonable doubt as to the existence or nonexistence of the fact in issue. (Evid. Code, § 501; Pen. Code §§ 1096, 1105; see *People v. Hardy* (1948) 33 Cal.2d 52, 63-66 [198 P.2d 865] [burden on defendant to go forward with the evidence but he need only raise a reasonable doubt as to his claimed unconsciousness]; *People v. Costello* (1943) 21 Cal.2d 760, 765-766 [135 P.2d 164] [when a defendant presents alibi evidence he need only create a reasonable doubt that he could have committed the crime]; see also *People v. Montalvo* (1971) 4 Cal.3d 328, 333-334, fn. 3 [93 Cal.Rptr. 581, 482 P.2d 205, 49 A.L.R.3d 518]; *People v. Agnew* (1940) 16 Cal.2d 655, 665-667 [107 P.2d 601] [when defendant claimed lawfulness of arrest as defense to a charge of false imprisonment he need only create a reasonable doubt whether the arrest was unlawful]; *People v. Roe* (1922) 189 Cal. 548, 560-561 [209 P. 560] [when defendant asserts defense of the person of another as a

defense to a charge of murder, she need only create a reasonable doubt that she killed with criminal intent]; *People* v. *Bushton* (1889) 80 Cal. 160, 164 [22 P. 127, 549] [although defendant has burden of proving mitigation in a homicide case (see § 1105), he need only create a reasonable doubt that the greater crime was committed]; *People* v. *Marshall* (1881) 59 Cal. 386, 388-389 [a defendant who asserts an intent to marry as a defense to a charge of taking a female for purposes of prostitution need only create a reasonable doubt that he took her for purposes of prostitution].)[9] Indeed, the United States Supreme Court has held it to be constitutionally impermissible to place on a defendant a burden heavier than that of raising a reasonable doubt as to circumstances of mitigation in a homicide prosecution. (*Mullaney* v. *Wilbur* (1975) 421 U.S. 684, 703-704 [44 L.Ed.2d 508, 522-523, 95 S.Ct. 1881]; see also *People* v. *Thomas* (1945) 25 Cal.2d 880, 896-897 [156 P.2d 7]; *People* v. *Wells* (1938) 10 Cal.2d 610, 619-623 [76 P.2d 493].)

There are, however, other instances of defenses asserted by an accused which raise factual issues collateral to the question of the accused's guilt or innocence and do not bear directly on any link in the chain of proof of any element of the crime. Among such defenses are those which raise no challenge to the sufficiency of the prosecution's proof of any element of the crime charged but for reasons of public policy insulate the accused notwithstanding the question of his guilt. (See Witkin, Cal. Criminal Procedure, § 343, pp. 335-336.) Entrapment is one of such public policy defenses (see *People* v. *Benford* (1959) 53 Cal.2d 1, 8-9 [345 P.2d 928]) and the collateral question whether an accused was entrapped must be proved by him by a preponderance of the evidence. (*People* v. *Moran* (1970) 1 Cal.3d 755, 760-761 [83 Cal.Rptr. 411, 463 P.2d 763].) In still other contexts factual issues which are collateral are raised by the assertion of defensive matter which challenges the *reliability* of particular incriminating evidence.[10] Again the factual issue raised, that is, the proof

---

[9] Among such defensive assertions could be an accused's contention that the crime was committed under duress or compulsion. (See § 26, subd. Eight.) If in so asserting the accused contends that he is not guilty of the crime charged because his free will was so overcome he did not act in the exercise thereof, he necessarily attacks the prosecution's allegation that he acted with criminal intent. (See *People* v. *Otis* (1959) 174 Cal.App.2d 119, 124-125 [344 P.2d 342].) As mens rea is an element of the crime charged (§ 20), it must be established beyond a reasonable doubt if the accused is to be convicted; hence he need only raise a reasonable doubt that he acted in the exercise of his free will.

[10] Among such challenges to reliability are objections on hearsay grounds and attempts to impeach a witness on the ground of the prior conviction of a felony or other attacks on credibility. We distinguish the basis upon which certain other evidence is excluded for reasons which are fundamentally different from a mere challenge to the reliability of that evidence. Thus evidence seized by the state in violation of constitutional prohibitions

of the fact upon which the challenge to reliability can be asserted, is collateral to the question of the accused's guilt or innocence. Proof of such collateral factual issue, as in the case of the proof of the factual issue on which the public policy defense rests, is not one which must be established in the direct chain of proof of the accused's guilt.[11] There is thus no constitutional compulsion that such collateral fact be proved beyond a reasonable doubt, nor does the presumption of the accused's innocence aid in the resolution of such fact.[12]

In those instances wherein an accused bears the burden of establishing factual matters which are preliminary to an attack on the reliability of incriminating evidence, he has not been deemed to have satisfied that burden merely by raising a reasonable doubt that the

may be excluded for policy reasons (see *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]) or because the receipt of such evidence would itself infringe a constitutional right (see *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]). Rules which have developed as to the burden of proof of facts which condition the receipt of evidence challenged on constitutional grounds are not here relevant. We note, nevertheless, that the United States Supreme Court has held that the voluntariness of a confession offered in evidence by the state need not be proved beyond a reasonable doubt. (*Lego* v. *Twomey* (1972) 404 U.S. 477, 486 [30 L.Ed.2d 618, 625-626, 92 S.Ct. 619].) It is stated in *People* v. *Jackson* (1971) 19 Cal.App.3d 95 [96 Cal.Rptr. 414], however, that "the burden is on the prosecution to establish waiver and voluntariness beyond a reasonable doubt." (*Id.,* at p. 101; see other Court of Appeal opinions in accord with *Jackson: People* v. *Daniels* (1969) 1 Cal.App.3d 367, 374 [81 Cal.Rptr. 675]; *People* v. *Stroud* (1969) 273 Cal.App.2d 670, 677-678 [78 Cal.Rptr. 270].) We do not now express any view as to the nature of the People's burden of proof of the voluntariness of an extrajudicial confession offered in evidence by the People.

[11]We note, however, that a challenge on grounds of reliability when asserted by an accused is, unlike a public policy defense, at least an *indirect* challenge to the accused's guilt. Proof of the particular incriminating evidence, which, of course, rests in part on the success of the challenge on grounds of reliability, may well constitute a link in the chain of proof of an element of the crime charged. But the initial factual determination to be made upon a challenge to the reliability of incriminating evidence is not a determination of the question of reliability itself, but rather a determination of a collateral factual question only after which the trier of fact may or may not consider the merit of the challenge to reliability. We deal now only with the burden of proof of the initial and collateral factual issue.

[12]When the People bear the burden of proof of a fact deemed to lie outside the direct chain of proof of an accused's guilt of the crime charged, they are not required to prove that fact beyond a reasonable doubt. Thus in *People* v. *Lisenba* (1939) 14 Cal.2d 403 [94 P.2d 569] we held that the People could establish the fact of a prior similar criminal act for the purpose of demonstrating a common scheme or design, without the burden of proving the prior crime beyond a reasonable doubt. (*Id.,* at pp. 429-432; see also *People* v. *Durham* (1969) 70 Cal.2d 171, 187, fn. 15 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Haston* (1968) 69 Cal.2d 233, 253 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Rosoto* (1962) 58 Cal.2d 304, 331 [23 Cal.Rptr. 779, 373 P.2d 867]; *People* v. *Albertson* (1944) 23 Cal.2d 550, 579 [145 P.2d 7].)

preliminary fact does or does not exist. The most common of such attacks are challenges to hearsay evidence because of its unreliability. The proponent of such a statement must overcome its questionable reliability by proof of collateral factual matters which bring the statement within an exception to the hearsay rule, thereby demonstrating its reliability. (See Evid. Code, § 405; *Lane* v. *Greyhound Lines* (1945) 26 Cal.2d 575, 582 [160 P.2d 21]; 5 Wigmore on Evidence, §§ 1362, 1420, 1422.) The court, which finds the existence or nonexistence of the preliminary fact (Evid. Code, § 405, subd. (a)), is not expressly required to so find by proof beyond a reasonable doubt and, when not "otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." (Evid. Code, § 115.) Although the law otherwise provides that an accused must be proved guilty beyond a reasonable doubt (§ 1096) *the law does not require such a degree of proof of factual matters not in the chain of proof of an accused's guilt of the crime charged. (People* v. *Haston, supra,* 69 Cal.2d 233, 253.) It thus follows that in the determination of a preliminary fact which conditions the admissibility of a hearsay statement to be considered on the merits by the trier of fact, the court's determination is to be made on proof by a preponderance of the evidence.[13]

---

[13]There are holdings which require a jury to disregard hearsay admitted as dying declarations or spontaneous statements unless it finds beyond a reasonable doubt the existence of the applicable preliminary fact, namely the declarant's sense of impending death (*People* v. *Hoffman.* (1925) 195 Cal. 295, 308 [232 P. 974]; *People* v. *Singh* (1920) 182 Cal. 457, 476 [188 P. 987]) or the spontaneity of his statement (*People* v. *Keelin* (1955) 136 Cal.App.2d 860, 872 [289 P.2d 520, 56 A.L.R.2d 355]). These cases, however, predate the Evidence Code, and the determination of the preliminary fact on a hearsay challenge to a proffered confession, dying declaration or spontaneous statement is now vested solely in the trial court as opposed to earlier procedures whereby the court first determined the existence of the preliminary fact and, if so found, submitted the matter to the jury with instructions to independently find the existence of the preliminary fact before considering the proffered statement on the merits. (See Legislative Com. comment. Evid. Code, § 405.) The commission states that the change in the law is equally applicable to dying declarations, spontaneous statements and confessions. As the preliminary finding by the court under the earlier procedures was not required to be made on proof beyond a reasonable doubt (see *People* v. *Gonzales* (1944) 24 Cal.2d 870, 876 [151 P.2d 251] ["However, if there is evidence that the confession was free and voluntary, it is within the court's discretion to permit it to be read to the jury, and to submit to the jury for its determination the question whether under all the circumstances the confession was made freely and voluntarily"]), the cited decisions do not support a contention that the court must now make the determination of the preliminary fact on proof beyond a reasonable doubt. The commission further states that the rule for determining the preliminary fact is now the same as in determining the admissibility of physical evidence claimed to have been seized in violation of constitutional guarantees. In *People* v. *Gorg* (1955) 45 Cal.2d 776 [291 P.2d 469] we held that the admissibility of such physical evidence is to be determined by the court as a matter of law. *(Id.,* at pp. 780-781; see also, Evid. Code, § 310, subd. (a).)

As in the case of a challenge to evidence on hearsay grounds an attack on the credibility of a witness is also a challenge to the reliability of his testimony. When that attack is based on the conviction of a prior felony the proof of such conviction does not constitute proof of a fact within the chain of proof of the accused's guilt of the crime charged, and there is no requirement that the prior conviction be established by proof beyond a reasonable doubt.

Accomplice testimony is suspect because, like hearsay, it too may be unreliable. "[E]xperience has shown that the evidence of an accomplice should be viewed with care, caution and suspicion because it comes from a tainted source and is often given in the hope or expectation of leniency or immunity." (*People* v. *Wallin* (1948) 32 Cal.2d 803, 808 [197 P.2d 734]; see also *People* v. *McRae* (1947) 31 Cal.2d 184, 186 [187 P.2d 741]; *People* v. *Dail* (1943) 22 Cal.2d 642, 654 [140 P.2d 828]; *People* v. *Coffey* (1911) 161 Cal. 433, 438 [119 P. 901]; 7 Wigmore on Evidence (3d ed.) § 2057, pp. 322-325.) In addition to being derived from a suspect source accomplice testimony is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate its credibility. " '[A]n accomplice is not merely a witness with a possible motive to tell lies about an innocent accused but is such a witness peculiarly equipped, by reason of his inside knowledge of the crime, to convince the unwary that his lies are the truth.' " (Heydon, *The Corroboration of Accomplices* (Eng. ed. 1973) Crim.L.Rev. 264, 266; see also Note, 54 Colum.L.Rev. 219, 234.)

At common law the fact that a witness was an accomplice resulted only in an instruction that his testimony was to be viewed with care, caution, and suspicion unless corroborated in any material matter by independent evidence. (*People* v. *Coffey, supra,* 161 Cal. 433, 438; see also 7 Wigmore on Evidence (3d ed.) § 2056, pp. 312-322, and cases cited therein at fn. 10.) The limitation based on the common law distrust of accomplices as now embodied in section 1111 is much harsher than the common law limitation. Juries are now compelled rather than cautioned to view an accomplice's testimony with distrust, for while his testimony is always admissible and in some respects competent to establish certain facts (see *People* v. *McRae, supra,* 31 Cal.2d 184, 187 [probable cause to hold defendant to answer at preliminary hearing]), such testimony has been legislatively determined never to be sufficiently trustworthy to establish guilt beyond a reasonable doubt unless corroborated. Whatever the use of the testimony, however, the limitation on that use is imposed because the uncorroborated testimony of an accomplice is deemed to be unreliable.

The degree of proof by which an accused must establish that a witness is an accomplice is the same as in other instances wherein he has the burden of establishing a collateral fact which conditions a challenge to the reliability of incriminating evidence. As in other such instances he cannot satisfy that burden by merely raising a reasonable doubt that the collateral fact does or does not exist. If he is to prevail he must do so by proof by a preponderance of the evidence, the next lighter burden imposed on a party who has the burden of proof.[14] (Evid. Code, § 502.) As the trial court so instructed the jury in the instant case there was no error.

Our conclusion as to the defense's burden of proof of accomplice status, when such status is urged by him, is also supported by an independent rationale. When it is urged by an accused that a witness is an accomplice there are *two* means by which the People may nevertheless vest the witness' testimony with reliability. One is to overcome the accused's proof that the witness is an accomplice. The other is to produce corroboration. The People may satisfy this latter requirement by proof of

---

[11]This issue has not heretofore been resolved in any authoritative case. In *People* v. *Johnson* (1971) 18 Cal.App.3d 458 [95 Cal.Rptr. 316, 96 Cal.Rptr. 695], the trial court instructed the jury that the defendant had only the burden of raising a reasonable doubt as to whether the witness was an accomplice. (*Id.,* p. 463). However, since that burden was favorable to the defense it was not challenged on appeal and consequently the Court of Appeal expressly declined to discuss its correctness. (*Id.,* at p. 464, fn. 3.)

The precise issue involved herein was raised and decided in two Court of Appeal decisions neither of which has any precedential value. In the first case the court initially held that the defense burden was only to raise a reasonable doubt. However, that portion of the opinion which dealt with the issue was subsequently ordered stricken, over the dissent of the author of the opinion (*People* v. *Sheffield* (1930) 108 Cal.App. 721, 735 [293 P. 72] [noted in 4 So.Cal.L.Rev. 323]). In the other case the court appears to reach the opposite result and reject the reasonable doubt standard (*People* v. *Clapp* (Cal.App. 1944). We granted a hearing, however, and disposed of the case on another issue without discussion of the burden of proof (24 Cal.2d 835 [151 P.2d 237] (1944)).

Among other jurisdictions which require corroboration of accomplices and which have passed upon the burden of proof issue there is a split of authority. The majority hold the defendant's burden to be proof by a preponderance (*Ross* v. *State* (1883) 74 Ala. 532, 536-537; *State* v. *Houston* (Iowa 1973) 206 N.W.2d 687, 689; *Early* v. *State* (1971) 13 Md.App. 182 [282 A.2d 154, 157-158]; *State* v. *Wong Si Sam* (1912) 63 Ore. 266 [127 P. 683, 686]; see generally annot. 19 A.L.R.2d 1352, 1358), while the minority require that he raise only a reasonable doubt (*Wood* v. *State* (Okla. Crim. 1959) 341 P.2d 613, 616). A similar division exists among text writers and commentators. (See 7 Wigmore on Evidence (3d ed.) § 2060, subd. (e), pp. 341-342 [preponderance]; 3 Wharton's Criminal Evidence (13th ed.) § 645, pp. 342-347 [preponderance]; Courts, *Accomplices: Functions of Judge and Jury* (1958) 22 J. Crim. L. 61, 64 [preponderance]; 1 Underhill's Criminal Evidence (5th ed.) § 175, pp. 335-336 [both standards stated]; Jefferson's Cal. Evidence Benchbook, § 45.2, subd. (3) [favoring reasonable doubt]; Williams, *Corroboration—Accomplices* (Eng. ed. 1962) Crim. L.Rev. 588, 594-595 [reasonable doubt]; Heydon, *The Corroboration of Accomplices* (Eng. ed. 1973) Crim. L.Rev. 264, 268 [reasonable doubt].)

factual matters which fall far short of establishing corroboration beyond a reasonable doubt. Although the evidence offered in corroboration must connect the accused with the commission of the crime charged, it "may be slight and entitled to little consideration when standing alone." (*People* v. *Wade* (1959) 53 Cal.2d 322, 329 [1 Cal.Rptr. 683, 348 P.2d 116]; see also *People* v. *Perry* (1972) 7 Cal.3d 756, 769 [103 Cal.Rptr. 161, 499 P.2d 129].) Certainly if the trier of fact can give full weight to an accomplice's testimony if that testimony is corroborated on meager proof, it likewise should be able to give full weight to that testimony if it appears that the witness is not an accomplice on proof which falls short of the standard of beyond a reasonable doubt.

Defendant also complains of the seizure of a .22 caliber handgun during a search of the Pedraza residence six days after the homicide at a time when defendant was no longer residing there. The homicide victim was killed by a bullet fired from a .22 caliber weapon, but the bullet was damaged to such an extent that a ballistics expert was unable to develop information essential to an identification of the gun from which the bullet had been fired. Sheila described during her testimony two guns which prior to the homicide had been in defendant's possession and had been taken from the Pedraza home, one each by defendant and Eribes when they left for the El Torito Restaurant on the evening of the homicide. When defendant and Sheila were arrested at a motel six days after the homicide, the People seized from defendant's immediate possession two guns which, Sheila first testified, were the same two guns she had seen in defendant's possession prior to the homicide. However, when the gun seized during the search of the Pedraza home was exhibited to Sheila she also recognized *it* as one of the two guns she had seen in defendant's possession.[15] The surviving victim of the robberies testified that one of his assailants was armed with a gun which was similar to the .22 caliber handgun seized from the Pedraza home and that the fatal shot was fired from such a gun. He could not, however, further identify the gun.

Defendant contends that the .22 caliber handgun taken from the Pedraza residence was seized in violation of constitutional prohibitions because the gun was not described in a warrant pursuant to which the People had searched the Pedraza home. Generally police officers may seize any contraband discovered in the proper execution of a search

---

[15]Only one of the guns seized when defendant was arrested, a .38 caliber automatic, was offered and received in evidence. The other gun, apparently a .22 caliber handgun although never expressly described as such, was not received in evidence.

warrant although the particular item is not described in the warrant. (See *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 157 [81 Cal.Rptr. 613, 460 P.2d 485].) The warrant in the instant case was obtained on the basis that there were narcotics present in the Pedraza home, and the handgun was discovered during a search which was reasonably limited to the discovery of concealed narcotics. It appears, however, that an officer charged with executing the warrant had been informed prior to the time application therefor had been made of the possible presence of a gun used in the robberies and homicide at the El Torito Restaurant, and that he anticipated the discovery and seizure of the gun during the narcotics search.[16]

Defendant relies on *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022] for the proposition that the seizure of an evidentiary item which the state knew or suspected would be disclosed during a purported search pursuant to a warrant for other contraband, is constitutionally impermissible. We do not deem it necessary to venture a solution to the puzzle of *Coolidge*[17] and conclude for the reasons which

[16]The suppression of the gun was sought on pretrial motion pursuant to section 1538.5. It appeared at the hearing thereon that for a month prior to the homicide the Pedrazas were under investigation for narcotic activity; that information incriminating the Pedrazas was being supplied to narcotic investigators by Richard Eribes, who later committed the homicide with defendant (see fn. 2, *ante*); that narcotic officers were not involved in the investigation of the homicide and robberies and were proceeding independently thereof; that although the narcotics officers were aware that Mike Pedraza possessed a gun which he might use in connection with his narcotic activities they were not aware that the gun might be a gun used in the El Torito Restaurant homicide until December 29, 1970, five days after the homicide and one day before the warrant was executed; that at the time the narcotics warrant was executed officers involved in the homicide investigation were also present; that large quantities of narcotics were found during the search and Mary Pedraza, who was then present, and later Mike Pedraza were arrested for narcotic violations. The gun was not included as a suspected item in either the affidavit or warrant because, according to the officer conducting the narcotics investigation, he did not wish to disclose the informer's identity and thereby jeopardize that source of information before the homicide investigation had been completed.

In denying the motion to suppress the gun as evidence, the court found that the search warrant was issued and executed in the course of an ongoing and proper narcotics investigation, and not as a mere pretext to afford an opportunity to seize the gun if found during the narcotics search. It also found that as a secondary reason for their search, the officers nevertheless hoped to discover and seize the gun.

[17]The plurality opinion of the court in *Coolidge* was delivered by Justice Stewart who was joined by Justices Douglas, Brennan and Marshall. The opinion, insofar as it is here pertinent, deals with the seizure and subsequent search of a vehicle parked in the defendant's driveway at the time of his arrest on a warrant charging a homicide. The vehicle was searched pursuant to a warrant therefor. However, the arrest and search warrants were not issued in accordance with Fourth Amendment requirements, and alternative grounds for the search of the vehicle were urged by the state as exceptions to the warrant requirement. The opinion, in responding to the state's argument that the

follow that the seizure of the gun and its receipt in evidence, even if contrary to *Coolidge,* does not require that the judgment be reversed.

Although the substantiality of the evidence connecting defendant to the crimes must depend on the testimony of an accomplice, that testimony compellingly demonstrates defendant's guilt. Sheila testified persuasively under aggressive cross-examination that she was present when defendant first suggested the crime and that defendant planned it

seizure was justified under a "plain view" doctrine, states inter alia a "plain view" limitation: "[T]he discovery of evidence in plain view must be inadvertent . . . . [W]here the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different." *(Id.,* at pp. 469-470 [29 L.Ed.2d at p. 585].) The opinion also states: "If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirements of 'Warrants . . . particularly describing . . . [the] things to be seized.' " *(Id.,* at p. 471 [29 L.Ed.2d at p. 586].)

It is arguable that the foregoing is dicta as there was in effect *no* warrant in *Coolidge;* that the instant case is factually distinguishable on the ground that the People here otherwise had good cause and had obtained a proper warrant for the intrusion and search, as found by the trial court in distinguishing *Coolidge* and in denying the motion to suppress; that because *Coolidge* post-dated the claimed improper seizure by six months it should not be given effect in this case (see *Stovall* v. *Denno* (1967) 388 U.S. 293, 297-298 [18 L.Ed.2d 1199, 1203-1204, 87 S.Ct. 1967]; *Linkletter* v. *Walker* (1965) 381 U.S. 618 [14 L.Ed.2d 601, 85 S.Ct. 1731]); and that no fifth justice expressly joined with the author and the three concurring justices for a majority holding on the pertinent issue. The quoted portions of the opinion appear in part II-C. Part II-D of the opinion is an attempt to treat and explain error in the dissenting views of Justice White *(id.,* at p. 474 [29 L.Ed.2d at pp. 587-588]), and does not itself purport to state any "holding." It does not contain express language as does part II-C which would require the suppression of all except "inadvertent" seizures of items not listed in a search warrant. (The following language *is* contained in part II-D: "the police must obtain a warrant when they intend to seize an object outside the scope of a valid search . . . ." *(Id.,* at p. 484 [29 L.Ed.2d at p. 593].) This language does not deal with the further issue whether an item of contraband in plain view, whether anticipated or not anticipated by the police, is "outside the scope of a valid search.") Justice Harlan concurs *inter alia* in part II-D but, apparently, not in part II-C although he does not expressly so state his views as to part II-C. The remaining justices all expressed views which were directly contrary to all portions of part II, insofar as here pertinent.

We have heretofore had occasions to analyze the various views expressed in *Coolidge.* In *People* v. *McKinnon* (1972) 7 Cal.3d 899 [103 Cal.Rptr. 897, 500 P.2d 1097], a majority of this court concluded that a majority of the United States Supreme Court had not joined in *Coolidge* in limiting the vehicle exception to the Fourth Amendment warrant requirements. *(Id.,* at p. 911.) The holding in *McKinnon,* however, is not pertinent to the issue here as it does not deal with the "plain view" exception to the warrant requirement. In *North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155], however, at least a majority of this court expressed the view that Justice Harlan had not concurred in the plurality opinion with respect to the proposed restriction on the "plain view" doctrine (i.e., that the doctrine is applicable only to "inadvertent" discoveries of incriminating evidence). *(Id.,* at p. 307.) Adherence to our majority view in *North* would thus foreclose defendant's contention in the instant case.

with others at the Pedraza home; that he armed and equipped himself and Eribes; instructed others at the Pedraza home to meet him and Eribes at a designated place after the planned robbery; that he left the Pedraza home for the purpose of committing the robbery; that he met with the others at the designated place and told them that he and Eribes had robbed two employees of the restaurant but had inadvertently shot one of the victims; and that he returned to the Pedraza home and divided the loot. All other testimony adduced at the trial, including the testimony of Mary Pedraza and the surviving victim of the robberies and testimony of the corpus delicti and the time, place and manner of the commission thereof, is consistent with Sheila's account.

The controversial gun, however, is of little significance in the overall evidence as the part it played in the commission of the crime, if any, was never established. Defendant's counsel aptly described the insignificance of such gun evidence in urging that it could not be deemed as corroborative of Sheila's testimony for purposes of section 1111. He stated that the gun was "many orders of magnitude removed from linking [defendant] to the matter. The gun was found at a different location [than that where defendant was arrested]. There is no identification that the gun was in fact the gun that was used . . . ."

We conclude that the evidence of defendant's guilt is overwhelming even without those inferences of guilt, if any, which may be drawn from the fact that a gun similar to that with which defendant or Eribes was armed on the evening of the homicide was later seized at the Pedraza residence. Assuming without deciding that the court erred in not suppressing the gun, we hold that such error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Defendant raises numerous other contentions, none of which merit discussion.

The judgment is affirmed.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J. and Richardson, J., concurred.