[No. H001214. Sixth Dist. Aug. 5, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLEN LEROY ENGERT, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III.

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Sarah Plotkin, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Ronald E. Niver and John T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BRAUER, J.**—Defendant Allen Leroy Engert appeals from the judgment after conviction by court trial. The court found defendant guilty of one

count of first degree murder, in violation of Penal Code section 187, and of one count of grand theft, in violation of Penal Code section 487. A prison term of 25 years to life for the murder conviction plus a consecutive term of 3 years for the grand theft conviction were imposed.

On appeal, Engert contends (1) the trial court erroneously denied his motion to suppress evidence seized under a search warrant issued on an affidavit which he claims contained intentional misstatements and omitted material facts, (2) the trial court erred in failing to suppress his statements to the police, and all fruits thereof, and (3) there was insufficient evidence of premeditation and deliberation to sustain a verdict of first degree murder.

## FACTS

Adria Sue Manning was killed in her apartment in San Jose during the early hours of May 16, 1979. The cause of death was strangulation by ligature. Marks on her neck indicated that either she or the ligature had moved during the strangulation. Abrasions on her lips indicated that she could have been gagged. Fresh injuries to both her wrists were consistent with ligature marks. Manning also received an injury to the inside of her rectum. Dried colonic mucosa, or bowel lining, consistent with the lining of Manning's rectum, was found on the handle of a hammer located near the bed where Manning was lying. It is uncertain whether Manning was alive or dead when she suffered the anal injury.

Manning's body was discovered by Orville Wimberly, her live-in companion of the past 10 years. On May 15, 1979, Wimberly left for work about 5 p.m., locking both the regular lock and a deadbolt on the front door. Manning was alone in the apartment. Wimberly returned about 7 a.m. the following morning. The deadbolt was unlocked but there were no signs of forced entry.

Wimberly found Manning dead on the bed, strangled. A rope was wrapped twice around her neck and knotted; a towel was across her mouth, tied in back. Wimberly removed both the rope and towel before contacting the authorities. Wimberly noticed that Manning was wearing a different nightgown than the one she had on when he left the night before, that a multicolored towel was on the bed with her body, and that the heater was on, which was unusual.

The apartment had been ransacked. Wimberly noted that several items were missing, including a suitcase, a Kodak camera which had been in a box on the living room coffee table, Wimberly's class ring, miscellaneous jewelry, an old stereo and speakers, and approximately $200 from Manning's purse.

At 1:48 a.m. on May 16, 1979, Edith Jensen, who lived in the apartment below Wimberly and Manning, was awakened by a loud noise which sounded like something being dropped upstairs. Between 1 and 2 a.m. she continued to hear loud noises, running, and voices. By 2 a.m., it was quiet.

Defendant Engert worked at a 7-Eleven store next to Manning's apartment. He had known her for approximately three months before her death. While Engert's wife Betty was in the last trimester of pregnancy, Engert and Manning had become lovers.

On May 16, 1979, Engert's wife noticed property in their apartment she had not seen before: a stereo and speakers, a suitcase, a Kodak camera, and a portable radio. On May 19, 1979, the San Jose Police Department seized most of this property pursuant to a search warrant. On that same date, Betty Engert turned the camera over to the police and her former employer, Peggy Webber, gave the radio to the police. According to Webber, Engert left the radio at her house on the 18th of May. Engert had told Webber, about a week before the homicide, that he would be getting a secondhand stereo.

On June 7, 1979, Betty Engert gave the police Wimberly's class ring, miscellaneous pieces of jewelry, and a piece of rope which she had never seen before and which she found in a kitchen drawer in their apartment. Wimberly identified most of the property recovered from Engert's residence as his.

Engert's fingerprints were found in Manning's apartment, one print on an empty vodka bottle near the bed, five on the empty Kodak camera box. A brown fiber found on the multicolored towel by the body matched fibers taken from Engert's apartment carpet. The rope used to strangle Manning and two pieces of rope found in Engert's apartment were originally part of the same rope.

Engert told police that he had a sexual relationship with Manning and that he had been in her apartment. He stated that his wife knew of his relationship with Manning. He also stated that he bought the stereo and some tapes from someone named "Bob" and paid $150 in cash for them. On the night Manning was killed, he claimed a woman named Melanie Drury babysat for his children, while his wife was at work for Peggy Webber. Drury testified that she had only taken care of Engert's children on one occasion, a couple of weeks before the homicide.

## I

### ADMISSION OF PHYSICAL EVIDENCE SEIZED *

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## II

### FIFTH AND SIXTH AMENDMENT VIOLATIONS

██ ██ Engert contends that the trial court erred in failing to suppress his statement to the police and all fruits thereof because his statement was obtained (1) in violation of *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) through fraud, trickery, and deceit, and (2) in violation of his Sixth Amendment right to counsel.

At 6:45 a.m. on May 19, 1979, Sergeants Arca and Rolen of the San Jose Police Department arrested Engert at the 7-Eleven store where he worked. The officers were aware that a complaint had been issued the day before naming Engert as the person who had killed and robbed Adria Manning. They did not tell Engert that he was under arrest. Instead, they persuaded him to go with them to be questioned by telling him that they were investigating a case, that they had talked to witnesses in the area and neighbors in the area, that they knew he worked in the store, and that they would like to talk with him to see what he knew about the case. Engert was not actually informed of his arrest until some time between 10:30 to 10:45 that same morning. The officers interrogated Engert prior to informing him that he was under arrest. They told him that they did not know "how you fit into this or if anybody fits into, but what we would like you know we have to advise people of their rights, ok?" The officers then read Engert his *Miranda* rights and he waived them and agreed to discuss the homicide with them. The officers admitted that the reason the fact of his arrest was not communicated to Engert prior to his interrogation was "the premise it would be more likely that he would respond to [their] questions," that "we didn't tell him he was under arrest so he would talk to us."

During the interrogation which followed Engert made incriminating statements regarding his relationship with Manning. Approximately three hours after he was cautioned, Engert was first told that the officers suspected him of killing Manning. After he answered some further questions regarding a stolen stereo, Engert stated, "I'm not answering any more ques-

---

* See footnote, *ante*, page 1518.

tions." Almost immediately thereafter Engert was advised that he was under arrest for murder and was formally jailed. Shortly after being informed that he was being put in jail for murder, Engert requested permission to make a phone call. Engert later testified that had the officers told him initially that he was under arrest he would not have talked to them: "I would have wanted an attorney present because I would want to know why they was [*sic*] suspecting me of murder."

a) *Fifth Amendment Violation*

Engert contends his statements to the police were obtained through fraud, trickery, and deceit in violation of his *Miranda* rights. We disagree that the trickery here induced Engert to waive the Fifth Amendment rights enunciated in *Miranda*.

■ Appellant is correct that a lie told to a detainee regarding an important aspect of his case can affect the voluntariness of his confession or admission. (*Miller* v. *Fenton* (3d Cir. 1986) 796 F.2d 598, 607; *Frazier* v. *Cupp* (1969) 394 U.S. 731, 737, 739 [22 L.Ed.2d 684, 691-692, 693, 89 S.Ct. 1420].) However, that lie must be analyzed in the context of all the circumstances of the interrogation and the fact that the police made misrepresentations does not necessarily render an otherwise voluntary confession inadmissible. (*Miller* v. *Fenton, supra,* at pp. 607-608; *Frazier* v. *Cupp, supra,* at p. 739 [22 L.Ed.2d at p. 693].)

■ Despite appellant's testimony to the contrary, we sustain the trial court's finding that waiver of the Fifth Amendment right to counsel was not here induced by trickery. Appellant voluntarily elected to talk to the police about the murder in the neighborhood and voluntarily accompanied them to the station for that purpose. He was carefully advised of his *Miranda* rights and expressly waived each. He then told the officer to "[a]sk away." He had on prior occasions been arrested, advised of his rights, and talked with police.

■ The question of waiver of the rights enunciated in *Miranda* must be decided on " 'the particular facts and circumstances surrounding [this] case, including the background, experience, and conduct of the accused.' " (*North Carolina* v. *Butler* (1979) 441 U.S. 369, 374-375 [60 L.Ed.2d 286, 293, 99 S.Ct. 1755], citing *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed.1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357].) ■ Here appellant was aware that he had the right to remain silent, to counsel, and that any statements he made could and would be used against him in a court of law; his waiver of his Fifth Amendment privilege was not induced by the misrepresentations which occurred.

b) *Sixth Amendment Violation*

■ Engert next contends that the police violated his Sixth Amendment right to counsel when prior to interrogation they purposely chose not to inform him that a complaint had been filed against him, instead intentionally misrepresenting to him that he was not even a suspect to the murder they wished to question him about. We agree with Engert that the police ploy precluded a knowing waiver of his Sixth Amendment right to counsel.

■ The Sixth Amendment right to counsel attaches at the commencement of adversarial judicial criminal proceedings. (*Brewer v. Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232].) ■ At the time the police interrogated Engert, a complaint had been filed against him: "The fact is that not only had suspicion for the crime of murder been focused on appellant at the time of the conversation, but he was by a filed complaint actually charged with commission of that crime. An adversary judicial process had been commenced against him as a defendant and he was entitled to counsel before the conversation was commenced." (*People v. Lebell* (1979) 89 Cal.App.3d 772, 778 [152 Cal.Rptr. 840]; see also *People v. Hannon* (1977) 19 Cal.3d 588, 604 [138 Cal.Rptr. 885, 564 P.2d 1203], *United States* ex rel. *Johnson v. Lane* (1983) 573 F.Supp. 967, 970; *Massiah v. United States* (1964) 377 U.S. 201 [12 L.Ed.2d 246, 84 S.Ct. 1199].) The People apparently concede that the Sixth Amendment right to counsel had attached at the time of questioning. But they argue that, because Engert did not have counsel at the time of the interrogation, the *Miranda* waiver obtained from him by the police prior to interrogation was adequate to satisfy the Sixth Amendment right to counsel. We disagree.

The leading United States Supreme Court opinion defining the test for waiver of the Sixth Amendment right to counsel is *Brewer v. Williams, supra,* 430 U.S. 387. The court in *Brewer* stated the basic rule in this way: "[I]t was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst* 304 U.S., at 464 [58 S.Ct. 1023] . . . . [C]ourts indulge in every reasonable presumption against waiver, . . ." (*Id.* at p. 404 [51 L.Ed.2d at pp. 439-440].)

In *Brewer* the United States Supreme Court expressly reserved ruling on whether *Miranda* warnings suffice for waiver of the Sixth Amendment right to counsel. (*Id.* at pp. 405-406 [51 L.Ed.2d at pp. 440-441].) More recently, in *Michigan v. Jackson* (1986) 475 U.S. 625, 635-636, fn. 10 [89 L.Ed.2d 631, 642, 106 S.Ct. 1404, 1411] the Supreme Court found it unnecessary to decide "the general relationship between Fifth and Sixth Amendment waivers."

However, several federal cases have either directly or impliedly held that the giving of *Miranda* warnings does not automatically satisfy a defendant's

Sixth Amendment rights. (See *United States* v. *Henry* (1980) 447 U.S. 264, 270-274 [65 L.Ed.2d 115, 122-125, 100 S.Ct. 2183]; *Brewer* v. *Williams, supra,* 430 U.S. at pp. 400-401 [51 L.Ed.2d at pp. 437-438], *Massiah* v. *United States, supra,* 377 U.S. 201, 204-206 [12 L.Ed.2d 246, 249-251]; *Carvey* v. *LeFevre* (2d Cir. 1980) 611 F.2d 19, 22, cert. den. 446 U.S. 921 (1980) [64 L.Ed.2d 276, 100 S.Ct. 1858]; *United States* v. *Mohabir* (2d Cir. 1980) 624 F.2d 1140 (2d Cir. 1980); *United States* v. *Brown (5th Cir. 1978)* 569 F.2d 236, 240-241; *United States* ex rel. *Sanders* v. *Rowe* (N.D.Ill. 1978) 460 F.Supp. 1128, 1140.)

The Second Circuit has held that failure to advise a defendant of a federal indictment against him precludes a finding that he knowingly, voluntarily, and intelligently waived his Sixth Amendment right to counsel. (*Carvey* v. *LeFevre, supra,* 611 F.2d at p. 22.)

While none of the other circuits has explicitly followed *Carvey,* the Ninth Circuit has held that *Miranda* warnings suffice for waiver of the Sixth Amendment right to counsel only once a defendant "has been adequately informed of his right to counsel and of the fact that formal judicial proceedings have begun against him . . . ." (*United States* v. *Karr* (9th Cir. 1984) 742 F.2d 493, 496 [defendant informed of arrest and indictment]; see also, e.g., *United States* v. *Mandley,* (9th Cir. 1974) 502 F.2d 1103 [defendant aware in custody and of pending charges]; *Coughlan* v. *United States* (9th Cir. 1968) 391 F.2d 371 [defendant aware of arrest, charges, and that counsel had already been appointed].)

Both the Seventh and Eleventh Circuits refused to endorse *Miranda* warnings as always sufficient for a Sixth Amendment waiver, considering it significant whether defendant was aware he was charged with a crime. (*Robinson* v. *Percy* (7th Cir. 1984) 738 F.2d 214, 222 [defendant aware of first degree murder charge]; *Tinsley* v. *Purvis* (11th Cir. 1984) 731 F.2d 791, 796 [defendant arraigned, aware of capital indictment and of his arrest].

The First Circuit agreed that an unrevealed indictment could be significant in determining whether there had been an intelligent waiver of Sixth Amendment right to counsel. (*United States* v. *Payton* (1st Cir. 1980) 615 F.2d 922, 924 [defendant aware arrested and processed].)

In each case we have reviewed in which a Sixth Amendment waiver was affirmed, at least the defendant was aware that he was in custody or under arrest, or that charges had been filed. Relying upon the above cited cases, we conclude that there can be no valid Sixth Amendment waiver of the right to counsel unless a defendant is informed, or it is otherwise established that he was aware, of his arrest or that charges have been filed against him. Here Engert was neither advised that a complaint had been filed against

him nor that he was under arrest; instead he was led to believe that he was not even a suspect in the case. His taped statements made at the police station after his arrest must be suppressed.

■ We conclude, however, that the error in admitting those statements into evidence does not require reversal.

■■ Engert's statements were in the nature of admissions, "recital[s] of facts tending to establish guilt when considered with the remaining evidence in the case," and not confessions which are "declaration[s] of defendant's intentional participation in a criminal act." (*People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620].) ■ The erroneous introduction of an admission is deemed prejudicial unless the People show beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

In *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669 ], the trial court erred in receiving defendant's admissions to the arresting officer. Although defendant's statement that he and his companion had left weapons at the stolen vehicles served to connect him with the homicides, "other, overwhelming circumstantial evidence" also connected him to the homicides. The Supreme Court summarized the evidence in support of the verdict, pointed out that defendant's admissions, "which tended to establish guilt only when considered with the remaining evidence in the case, pale in significance when so considered" (*id*. at p. 319), and concluded that the error was harmless beyond a reasonable doubt. (*Ibid*.; see also *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 972 [127 Cal.Rptr. 135, 544 P.2d 1335] [evidence of guilt overwhelming even without inferences of guilt drawn from tainted evidence]; *People* v. *Middleton* (1969) 276 Cal.App.2d 566, 573-574 [81 Cal.Rptr. 32] [evidence of guilt overwhelming without erroneously received extrajudicial statement to police and photograph].)

■ The evidence challenged by defendant Engert in this case, although incriminatory, similarly "pales in significance" in relation to the central evidence of guilt. Engert never acknowledged criminal participation in the homicide. He did admit that he and Manning had been lovers and that he had been in her apartment on prior occasions. He admitted that he made a brief visit to the 7-Eleven near Manning's apartment on the night of the homicide, but claimed he simply went to the store and immediately returned home. He admitted that during his prior visits to Manning's apartment he had handled some wine and liquor bottles as well as one of the suitcases in the spare bedroom. However, he denied ever taking anything out of Manning's apartment or handling her camera.

On the other hand, it was established without Engert's admissions that he had an ongoing relationship with the victim and that he had been in the vicinity of her apartment on the evening of the killing. His fingerprints were found in Manning's apartment, one print on a vodka bottle near the bed, five on an empty camera case. A brown fiber found on the multicolored towel by the body matched fibers taken from defendant's apartment carpet. The rope used to strangle Manning and two pieces of rope found in his apartment were originally part of the same rope. Much of the property stolen from Manning's apartment on the evening of the killing was recovered from defendant's apartment, including a stereo and the camera taken from the case which was covered with defendant's prints. Engert had told a friend, about a week prior to the homicide, that he would be getting a secondhand stereo.

We are satisfied beyond a reasonable doubt that the trial court's verdict of guilty would have been the same even if Engert's statements had not been introduced.

## III

### SUFFICIENCY OF THE EVIDENCE *

. . . . . . . . . . . . . . . . . . . . . .

## IV

### JUDGMENT

The judgment is affirmed.

Agliano, P. J., and Capaccioli, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 14, 1987.

---

\* See footnote, *ante*, page 1518.